EVANS *v.* BELMONT LAND CO.

(*Nashville.*    March 4, 1893.)

1. EJECTMENT.   *Plaintiff's title.*

In ejectment, the plaintiff must recover upon the strength of his own title.   The weakness of his adversary's title will not avail.   Outstanding title in third person will defeat plaintiff's recovery.   (*Post, pp. 350, 351.*)

2. EXECUTION SALE.   *Only legal titles subject to.*

Only legal titles are subject to execution levy and sale.   (*Post, p. 355.*)

Cases cited and approved : Springer *v.* Smith, 3 Lea, 737 ; Henderson *v.* Hill, 9 Lea, 25 ; Smith *v.* Taylor, 11 Lea, 738.

3. HOLDER OF LEGAL TITLE.   *His equities.*

The holder of the legal title to land can retain it against the party otherwise entitled to demand it, until the latter has paid all debts due from him to such holder on any account whatever.   (*Post, pp. 358, 359.*)

Cases cited and approved : Williams *v.* Love, 2 Head, 84 ; White *v.* Blakemore, 8 Lea, 62.

4. PURCHASER AT EXECUTION SALE.   *Caveat emptor applies.*

*Caveat emptor* applies with full force to purchaser at execution sale. Such purchaser must abide by the title of the execution debtor.   He occupies no higher ground than the debtor himself.   (*Post, pp. 360, 361.*)

Cases cited and approved : Click *v.* Click, 1 Heis., 607 ; Henderson *v.* Overton, 2 Yer., 396 ; Bumpas *v.* Gregory, 8 Yer., 58 ; Arendale *v.* Morgan, 5 Sneed, 705 ; Berry *v.* Walden, 4 Hay., 179 ; Simmons *v.* Tillery, 1 Tenn., 275 ; Brown *v.* Bigley, 3 Tenn. Ch., 629.

5. EQUITABLE ESTOPPEL.   *Not applicable.*

The facts of this case, fully set out in the opinion, will not justify the

application of the doctrine of equitable estoppel in complainant's favor.

## FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

VERTREES & VERTREES, LYTTON TAYLOR, and STEGER, WASHINGTON & JACKSON for Evans.

J. C. BRADFORD. and BAXTER & HUTCHESON for Land Co.

LURTON, C. J. This is a bill of ejectment. The lot in controversy is known as No. 64 in the O. B. Hayes plan of lots. The bill is filed for the purpose of canceling certain deeds affecting complainant's claim of title, and to recover possession, the lot being adversely held by the defendant. The title of complainant rests upon a judgment in favor of W. H. Evans, the husband of complainant, against Henry M. Hayes, and a levy and Sheriff's sale of the lot as the property of said Hayes. The lot was bid in by the execution creditor, who afterward assigned his bid to his wife, in consideration of an alleged debt to the wife. The execution sale occurred May 10, 1873, and in August, 1875, the Sheriff made deed to

Mr. Evans, the complainant. The judgment, levy, sale, and Sheriff's deed are regular, and no question is made as to them. The lot was unoccupied at time of levy and sale; but in 1883 it was inclosed by Mrs. Adelicia Cheatham, under whom the defendant company holds. It remained in her adverse possession until her sale to the Belmont Land Company, and, since that sale, has been in the adverse possession of her vendee. As Mrs. Evans has all the time been a married woman, the statute of limitations has not barred her suit. The legal title to this lot was not in Henry M. Hayes at the time of the levy or sale, but was outstanding in the heirs of John T. Edgar. These heirs were under legal disabilities, and the adverse possession of neither 'the defendant or its vendor has operated to divest that title or bar the remedy to recover possession. That title, pending this suit, has been acquired by the defendant company. This statement as to the title of the execution debtor would ordinarily be conclusive against complainant's suit as a mere ejectment bill. The cause must, however, turn upon the effect of certain other facts yet to be stated, which, it is insisted, operate as an estoppel upon the defendant company to dispute the existence of a good and sufficient legal title in Henry M. Hayes at the time of the levy and sale of this lot as his property. This claim of estoppel rests upon the following state of facts:

Mr. O. B. Hayes, the father of Henry M.

Hayes—under whom complainant claims—and of Mrs. Adelicia Cheatham—under whom the defendant holds—died testate, leaving by his will a large parcel of land, adjoining the property owned and occupied by Mrs. Cheatham, and known as "Belmont," to five of his children, as tenants in common. Henry M. Hayes was one of these devisees. Mrs. Cheatham had, by marriage, acquired a large fortune, and hence consented that her father's estate should be devised to her five brothers and sisters. She therefore had no interest in the lands so devised.

Sometime in 1865 the five Hayes devisees became desirous of partitioning this O. B. Hayes land among themselves. A strip of this land, containing about four and eight-tenths acres, was so situated with reference to "Belmont" that Mrs. Cheatham desired it, and it was accordingly agreed that if they would convey to her this strip, she would let them have, and permit them to include in the proposed partition, a piece containing five and three-fourths acres, adjoining both Belmont and the O. B. Hayes land, and known as the "Edgar" lot. This agreement is stated in the answer of the Belmont company in these words:

"In the improvement of the Belmont property *she needed* a piece of about four and eight-tenths $(4\frac{8}{10})$ acres, which belonged to her father's estate, and she orally agreed with her father's devisees that if they would convey to her said piece of four and eight-tenths $(4\frac{8}{10})$ acres of land, she

would allow said Edgar land to be partitioned among said devisees *as though it were a part of the estate of her father*, said O. B. Hayes. * * *

"When the lands of the said O. B. Hayes were partitioned among his devisees, the said Edgar land was also partitioned, and was *designated in the plan* of said partition as lots 63 and 64. Lot 63 was assigned to Mrs. Corinne Lawrence, who was a sister of the said Mrs. Acklen, or Cheatham."

The lands owned by the Hayes heirs, and the "Edgar" parcel, which they got from Mrs. Cheatham by the exchange, were all partitioned as one body. They were divided into seventy-one lots, with convenient streets. A plot or plan of these lots and streets was made November 9, 1865, and registered in book 21, page 87, of the Register's office. By the deed of partition these streets were made public streets. The lots were numbered from one to seventy-one, inclusive. Two of the heirs got fourteen and one-half lots each, and three of them got fourteen lots each.

As stated in the answer, this Edgar lot was partitioned *as if part of the O. B. Hayes land,* and became lots 63 and 64 in the plan of division. Under the partition agreement between the Hayes heirs, made in 1866 and duly registered, lot 63 was assigned to Mrs. Lawrence, and lot 64, the one in dispute, to Henry M. Hayes.

This agreement for an exchange was in parol, and no step was taken to carry it out until September 23, 1876, three years after the sale under

execution of lot 64, when four of the five Hayes devisees, including Henry Hayes, joined in a *quit-claim* deed to Mrs. Cheatham, conveying to her their interests in the strip she was to receive in exchange for the Edgar lot. This deed contains the following recitals:

" Whereas, in the division of the property of O. B. Hayes, deceased, certain real estate belonging to Mrs. Adelicia Cheatham was _considered part thereof_, and the same *fell* to the share of W. L. B. Lawrence and wife, Corinne, and Henry M. Hayes, and was known as the *property bought* by said Adelicia Cheatham, formerly Acklen, of Dr. Edgar, and in consideration said Adelicia would convey said property to the heirs of O. B. Hayes, and *allow it to be divided as a part thereof*, said heirs were to quitclaim to her certain real estate herein described; now," etc.

Joel M. Hayes refused to join in this deed, and the title to his 'one undivided fifth is outstanding in his heirs. Mrs. Cheatham has never conveyed the Edgar lot to the Hayes heirs, or to Henry M. Hayes or Mrs. Lawrence, to whom, as lots 63 and 64, it fell in the partition. But an explanation is found for this in the fact that about the time she received the conveyance to the strip she derived from them, she also took *quitclaim* deeds from Mrs. Lawrence and H. M. Hayes for lots 63 and 64.

Mrs. Lawrence's deed is dated September 22, 1876, and recites that it is made in consideration

23—8 P

and in part payment of a note due from her to Mrs. Cheatham, and dated July, 1871.

The deed from Henry M. Hayes is dated October 2, 1876, and recites that the consideration was a part payment of a note due Mrs. Cheatham, and dated March, 1870.

These quitclaim conveyances were evidently executed for the purpose of relieving Mrs. Cheatham from her oral agreement, and in consideration of the indebtedness then existing to her, which was, in fact, thus paid. But for the intervening levy on and sale of lot 64, no question whatever could remain concerning this executory agreement for an exchange of this Edgar land. These quitclaim conveyances were a complete release to Mrs. Cheatham, and her claim and ownership of these lots— the execution sale out of the way—could not be a matter of controversy as between herself and the Hayes heirs.

Was there any legal or equitable obstacle which prevented Mrs. Cheatham from acquiring the equitable interest of Henry M. Hayes in lot 64? Did he have any such title or interest at the date of levy as was the subject of levy at law?

It has been argued that the partition agreement between the Hayes devisees operated as a conveyance by each to the other. That would be true as to all the lands embraced in that partition deed held by the parties thereto under the will of O. B. Hayes as tenants in common. But the *title* to lot 64 was never in O. B. Hayes, or in the par-

titioning devisees. The conveyance in partition could not, therefore, operate to vest in H. M. Hayes any greater title than was in the parties to the deed. At most, this partition deed amounted to mere color of title.

To admit that one holding under mere color of title has such a title as is subject to levy, would not advance the solution of this case. Complainant could not recover in ejectment upon a showing that she had acquired a *color of title*. She must show that she has a *perfect legal* title, and recover upon the strength of her title, and not upon the vices in the adversary title.

Whether *the* legal title to this lot was in the Edgar heirs or in Mrs. Cheatham, at the date of the levy, is a matter of little importance. *It was not in the execution debtor.* In this State, by uniform decisions extending through nearly a century, an execution can only be levied upon a legal title. *Springer* v. *Smith*, 3 Lea, 737; *Henderson* v. *Hill*, 9 Lea, 25; *Smith* v. *Taylor*, 11 Lea, 738.

In the reply brief to assignment of errors filed by appellant, counsel for Mrs. Evans tersely state their contention in these words:

"We admit that no deed or written conveyance was ever in fact executed by Mrs. Cheatham to H. M. Hayes, but her conduct with respect to this land was such as to *estop* her, and those claiming under her, and to validate the title of H. M. Hayes."

This contention proceeds upon the assumption

that the legal title was in Mrs. Cheatham. We shall, for the present, treat the case as if this were true. The *conduct* of Mrs. Cheatham relied upon as an estoppel may be briefly stated as follows:

(1) She agreed to receive in exchange for the Edgar land a strip of the Hayes land, and that the Hayes devisees might partition the Edgar land as if it were part of the Hayes tract.

(2) That, under this agreement, the Edgar land was surveyed as if part of the Hayes land, and the two parcels subdivided into lots, and a plat showing this subdivision was placed upon record.

(3) That Henry M. Hayes and Mrs. Lawrence, to whom the Edgar land fell in the partition, gave up to the other Hayes devisees an equivalent in other lands of the testator for these lots, and that to permit Mrs. Cheatham to assert her title to the Edgar land would be to deprive them of the value of the land they had surrendered to their co-devisees as an equivalent in partition; that they were led to accept these lots in reliance upon her agreement, and that she should not be permitted to assert her title as against them.

(4) That she had subsequently recognized the partition made by the Hayes heirs, by buying, in 1870, lot No. 70 in that plot from O. B. Hayes, Jr., and taking deed reciting the plan of division. That she took a deed from H. M. Hayes, in 1870, to lot No. 71 under that plan, and took from him, the same year, a mortgage covering the remainder

of the lots assigned to him under that partition, save lot 64 now in controversy.

Does all this conduct and recognition operate such an equitable estoppel upon Mrs. Cheatham as to prevent her from setting up her title as against Henry M. Hayes? Manifestly, if H. M. Hayes was now the complainant, it would be a conclusive answer that, after lot 64 had been assigned to him, he had, for a valuable consideration, quitclaimed by his deed of 1876. But complainant contends, and justly, that her rights must depend upon the status existing at the date of the levy in 1873, and that at that time Mrs. Cheatham would have been estopped to deny that he had obtained her title. Let us see just what were the equities then existing against and in favor of Mrs. Cheatham.

At that time no conveyance had been made to her of the strip she was to receive in exchange. If she was in equity bound to convey the Edgar land to the Hayes devisees, they were equally bound to convey to her the parcel she was to receive in exchange. H. M. Hayes, as the assignee of the Hayes devisees to lot 64, stood upon no higher ground than they stood, and she could not have been compelled to carry out the agreement of exchange unless it was mutually performed.

But it is said that thereafter, to wit, in 1876, *four* of the Hayes devisees, including Henry M. Hayes, did convey to her their interests in the strip she wished to add to Belmont. The acceptance of this conveyance, made in pursuance of the

original agreement for an exchange, every thing else out of the way, was such performance as equitably entitled Henry M. Hayes to call for the legal title to the lot assigned him in partition. But there was another and distinct equity in favor of Mrs. Cheatham at the date of her acceptance of the title to her strip. This new and distinct equity was this: Henry M. Hayes was then heavily indebted to her. This indebtedness *probably* arose before lot 64 was set off to him; but it certainly existed in July, 1870.

If it be conceded that the acceptance, in 1876, by Mrs. Cheatham of the title to the strip she desired, inured to the perfection of the title of one claiming under a levy made three years before, then we are confronted with the question as to the effect of the other fact, the fact that at the date of that levy the execution debtor was heavily indebted to the holder of the legal title of the lot upon which the levy was made. This indebtedness was secured in part by a mortgage taken in 1870 upon all of the lots set off to Henry M. Hayes by the deed of partition, *except lot* 64. This exception is significant. Hayes had no possession of lot 64. He did not have the title. The agreement between the Hayes heirs and Mrs. Cheatham was still unexecuted on either side. We have already seen that non-performance by the Hayes heirs in equity relieved Mrs. Cheatham. For this reason, perhaps, lot No. 64 was not included in his mortgage. But for another reason its inclusion

was unnecessary. She held the legal title, and could not be required to surrender or convey her title until this debt was paid. She was entitled to withhold the title as a security. It was immaterial to the assertion of this equity that the indebtedness arose from independent transactions wholly disconnected with the title which she withheld. *Williams* v. *Love*, 2 Head, 84; *White* v. *Blakemore*, 8 Lea, 62.

Stripping the case of all the consequences attributable to the fact that at the date of the levy on this lot the Hayes heirs had not carried out, or offered to carry out, their side of the agreement for an exchange, and treating the case as if Mrs. Cheatham had received title at the time the Edgar land was subdivided as if part of the Hayes land, we have this situation at the date of the levy in 1873 on this lot: Namely, that after this part of the Edgar lot fell to H. M. Hayes, and after he became entitled by reason of all that had gone before to call for the legal title, he became indebted to Mrs. Cheatham. At once there arose a new equity. She was entitled to withhold this legal title until this debt was paid. In this situation the lot is levied on and sold at execution sale.

Clearly, at the date of this levy, Mrs. Cheatham's equity was such that Hayes could not have compelled her to convey to him this lot, even though she had *then* received title to the strip she was to receive in exchange. So, holding the legal

title, she would have been entitled, in a Court of Equity, to subject his equitable interest in this to the satisfaction of her debt. Recognizing this equitable right, H. M. Hayes, by *quitclaim* deed, and in part satisfaction of the debt, to secure which she was entitled to hold the legal title, conveyed or relinquished his equitable rights in this lot. As between himself and his creditor, he, by this relinquishment, did no more than a Court of Equity would have compelled him to do.

If we assume that H. M. Hayes had a *leviable* title by reason of the partition agreement purporting to convey title, and that the acquisition of this *leviable* title operated to give the purchaser the *equitable rights* and *interests* of the execution debtor, then what were those rights?

Clearly, a purchaser at execution sale stands in no higher situation than the execution debtor.

The Chancellor, in effect, treats the purchaser at an execution sale with as favorable consideration as is extended to an innocent purchaser for a valuable consideration without notice.

This Court, on the contrary, holds that a purchaser at a Sheriff's sale is *not* to be regarded as "a purchaser for a valuable consideration." *Click* v. *Click*, 1 Heis., 612.

"*Caveat emptor* is the undoubted rule in relation to titles in cases of execution sales of land." *Henderson* v. *Overton*, 2 Yer., 396; *Bumpas* v. *Gregory*, 8 Yer., 58.

"He buys at his peril, and occupies the attitude

of a mere assignee by operation of law; nothing is taken in his favor, and he must stand upon strict law." *Arendale* v. *Morgan*, 6 Sneed, 715.

The purchaser at execution sale "must take precisely as the defendant held—subject to all equities that he was," etc. *Berry* v. *Walden*, 4 Hay., 179; *Simmons* v. *Tillery*, 1 Tenn., 268; *Brown & Reid* v. *Bigley*, 3 Tenn. Ch., 629.

Learned counsel for complainant have endeavored to avoid the inevitable result which must follow, by insisting that the rule that one having the legal title may retain it, as against the equitable owner, as a security, etc., does not apply to this case. In the printed brief this is said as an answer to this doctrine:

"The facts to which the appellant seeks to apply this doctrine may be stated thus: 'Mr. Hayes owed Mrs. Cheatham money; the legal title to lot No. 64 is in Mrs. Cheatham. Mrs. Cheatham never refused to convey on the ground that H. M. Hayes owed her. Nevertheless, the Belmont Land Company, as assignee of Mrs. Cheatham, can defeat this action of ejectment, unless Mr. Hayes pays Mrs. Cheatham what he owes her.'

"It is obvious that, even if Mrs. Cheatham had the legal title to lot 64, she was not *obliged* to refuse to convey it until the money she had loaned H. M. Hayes in an independent transaction had been repaid. It was a matter about which she could do as she pleased. Certain it is, that it was none of the Belmont Land Company's business

whether she demanded her debt of her brother or not. And equally certain it is, that she never did make any demand, or refuse to convey lot No. 64, for the reason such demand was not complied with; neither is *she* doing so directly or indirectly in this case. It follows that the Belmont Land Company has no right to do so."

We reply to this that she *did* retain the legal title, and that, many years before the Belmont Land Company acquired any interest, she took from Hayes a relinquishment of his equitable title, and in part payment of the debt on account of which she was entitled to withhold the legal title. The creditor has long since asserted this right, and the debtor has recognized it. The Belmont company simply insists that at that time the purchaser at execution sale had no such legal or equitable right as would prevent this relinquishment from taking effect. What was done *then* was in accordance with the legal and equitable rights of the persons respectively owning the legal and equitable titles. The status of Mrs. Evans is no better than that of Henry M. Hayes. At most, she, in 1873, acquired his *equitable* title, and held it subject to the superior equity of Mrs. Cheatham.

The assignee of such a title, whether by deed or operation of law, must take it subject to all the equities against the assignor. One of the deeds which clouds her title, and which, by this bill, she seeks to cancel, is the quitclaim and relinquishment, executed in 1876, by Henry Hayes to Mrs.

·Cheatham. If this relinquishment was upon a full and fair consideration, and in part satisfaction of a debt, to secure which she was entitled to withhold the legal title, then it should not be disturbed. Its effect was to do, by agreement between ·creditor and debtor, precisely what a Court of Equity would have done, although the debtor had assigned his equity, or, by operation of law, it had passed to another.

The case of *Williams* v. *Love, supra,* is an instructive one concerning the rights of a purchaser of an equitable title. Love and McLemore jointly owned two tracts of land, each owning an undivided one-half. By agreement the title had been taken in Love's name. While thus held, McLemore became indebted to Love, partly on account of the land matter, but more largely by reason of wholly independent transactions. While thus indebted, McLemore conveyed an undivided one-half in trust to Gwinn, to secure Gwinn in certain indebtedness. When Gwinn took this conveyance he was indebted to Love in a large sum. Afterward, Gwinn assigned his debts on McLemore to Williams, and also assigned his interest in and under the trust. Williams now filed a bill against Love's heirs and executors, and against McLemore and Gwinn, to subject McLemore's one undivided half in the land held by Love to the satisfaction of the claim so assigned to him. This Court held that the rule which was applicable to McLemore was applicable to his assignee, Gwinn, and that

he could not obtain the title until the debt due from him to Love was also paid. The Court said:

"The equity of the estate [of Love] being at least equal to that of McLemore or Gwinn, and the executors, heirs, and devisees of Love having the legal title in these lands, must, in a Court of Equity, prevail. Williams, in this case, is in no better situation than Gwinn, and Gwinn in no better condition than McLemore. There is no better settled rule in equity than this, that a purchaser of an equitable title must always abide by the case of the person from whom he buys." 2 Head, 86.

In view of the equities in favor of Mrs. Cheatham at date of the levy under which complainant holds, is there any case for the application of the doctrine of equitable estoppel? The effect of such estoppel upon a title is thus stated in Beach on Modern Equity Jurisprudence:

"The fact that real estate is affected does not prevent the application of the doctrine of equitable estoppel. The authorities establish the doctrine that the owner of real estate may, by an act *in pais*, preclude himself from asserting his legal title; and where this principle is applied to real estate, it is *effective as a deed would be* from the party estopped." Vol. II., Sec. 1113.

With respect to the same doctrine, Mr. Pomeroy says:

"While the owner of the land may, by acts *in pais*, preclude himself from asserting his legal title,

it is obvious that the doctrine should be sparingly applied, and only on the disclosure of clear and satisfactory grounds of justice and equity. It is opposed to the letter of the statute of frauds, and it would greatly tend to the insecurity of titles, if they were allowed to be affected by parol evidence of light and doubtful character." 2 Pom. Eq., Sec. 801.

Again, he says:

"Equitable estoppel, in the modern sense, arises from the *conduct* of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel." *Id.*, Sec. 802.

The Chancellor seemed to be of opinion that a mere execution creditor, or a purchaser at such a sale, occupied, in some way, a better situation than did the execution debtor. We have already seen that there is no foundation whatever for this assumption. Such a purchaser must abide by the title of the execution debtor, non-registration out of the way. Mrs. Cheatham in no way misled, by

any *conduct*, this purchaser. She was not at the sale, said nothing to induce the levy. The single fact that she had permitted the partition of the Edgar land as if part of the Hayes land, and afterwards recognized the plan of the Hayes subdivision by buying certain other lots shown on said plan, constitutes her *conduct*. After this subdivision, and after · part of the Edgar land had been set off to H. M. Hayes, a new equity arose in her favor, and against H. M. Hayes, by reason of his indebtedness to her. She had the legal title, and was not thereafter bound to surrender it until · her debt was paid. The creditor, who levied upon a mere equitable title, now seeks to show that it was in fact a legal title, by ignoring this equity, which arose in her favor so soon as lot sixty-four fell to H. M. Hayes, or, at any rate, so soon as he thereafter became indebted to her, and thus estopping her to deny that she had already conveyed the legal title. It would be inequitable and unjust to set up an equitable estoppel under these facts.

Discussing the circumstances under which an equitable estoppel arises, Mr. Justice Swayne said:

"This remedy is always so applied as to promote justice. It is available only for protection, and it cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond that." 100 U. S., 581.

We have discussed this case upon the assump-

tion that the legal title to the Edgar land was in Mrs. Cheatham. This has been the theory of complainants, and certainly is as favorable a view of the matter as could be taken. In fact, this was not so. So far as the evidence shows, Mrs. Cheatham had no kind of title, legal, equitable, or pecuniary, in 1865, at date of the agreement for partition, or in 1873, at date of levy and sale of this lot. The legal title was in the heirs of Dr. J. T. Edgar until after institution of this suit, when it was conveyed by those heirs to the Belmont company. Mrs. Cheatham had for many years claimed this property, and she had possession from 1847 to 1863, when her inclosures were broken down, and not restored until 1884. Having had no color of title, her possessory right was lost by abandonment of possession in 1863. The possession which began in 1884 was ineffectual as a bar of the Edgar title, because that title was then in persons under disability.

The complainant has no such case as to prevent the defendant company from either acquiring this outstanding title, or relying upon it as an outstanding superior title. Complainant's case stands upon its best presentation when it is assumed that Mrs. Cheatham had the title when she agreed that this land might be partitioned. It is therefore unnecessary to consider the case further. She obtained this lot for a trivial sum. She stood by for seventeen years without taking possession, or endeavoring to assert her title. The property has

since greatly advanced in value. The equities of the defendant company are fully equal to her own. In such case, the legal title must prevail, whether it be outstanding or in defendant.

Reverse the decree, and dismiss the bill.