## INTERSTATE CO. v. BRY-BLOCK MERCANTILE CO.

District Court, W. D. Tennessee, W. D. May 30, 1928.

No. 1001.

Clinton H. McKay, of Memphis, Tenn., for plaintiff.

Thos. A. Evans, of Memphis, Tenn., for defendant.

### Statement of Facts.

ANDERSON, District Judge. Plaintiff has filed its bill of complaint, with supporting affidavits and a prayer for a

temporary injunction, and defendant has moved to dismiss for legal insufficiency. Therefore the facts to be stated are taken entirely from the plaintiff's pleadings, where naturally their statement is fully as strong as the ultimate facts could possibly warrant, and in addition thereto the inferences and deductions therefrom are to be taken in favor of plaintiff. Whatever facts the ultimate record may disclose on final hearing, at this stage of the hearing the facts—at least those facts to be considered by the court—are as follows:

The complainant is a Delaware corporation engaged in the restaurant business, and the defendant is a Missouri corporation, with its principal place of business in Memphis, where it conducts a large department store. The matter in dispute involves more than $3,000, exclusive of costs and interest, and consists of an equitable claim to a leasehold interest in real property situated within the Western division of this judicial district.

Prior to January 1, 1927, the Britling Cafeteria rented space and conducted a restaurant in Bry's store. Its lease and contract expired on that date and were not renewed. The defendant desired the restaurant to be continued for the convenience of the patrons of its store. The president of the Bry-Block Company at that time was John Mench, and E. M. Salomon was its first vice president. Before the expiration of the Britling contract, Mench went to St. Louis and there began negotiations with H. C. Koehler, senior vice president of plaintiff, for the latter to take over the restaurant, rent the premises occupied by it, and buy the Britling fixtures. The terms of the trade were substantially agreed on, and among others the plaintiff was to have a five-year lease, with an option to renew for another five years, and the management of the defendant was to assist plaintiff in obtaining the Britling fixtures and equipment at a fair price.

On January 12, 1928, plaintiff reduced this agreement to writing and Koehler, accompanied by Aymar, another vice president of plaintiff, took the contract to Atlanta, where Mench, the defendant's president, was visiting on business, and there the representatives of the two concerns went over it in detail; Mench stating that the contract contained the agreement previously entered into, but that he wanted it to conform, in verbiage, to a contract between the Nugent Company, of St. Louis, and the defendant, and he also wanted its approval by the general counsel of the defendant in New York. He told the representatives of the plaintiff, however, that he would sign the contract, containing the stipulations as written, except for formal changes to make it conform to the Nugent contract, requested them to act as though the contract were already signed, and urged them to hasten the opening of the restaurant.

Plaintiff, on the request of defendant's president, and with the assistance of Mench and other officials of the defendant, purchased the Britling equipment for $11,000. This equipment was adapted for use in the premises where it was located, was not susceptible of use elsewhere, and some of it was in the form of fixtures attached to the premises, which probably, in law, would be the property of the landlord. The complainant also spent some $3,000 or $4,000 in cleaning, renovating, and redecorating the rooms where the restaurant was to be conducted, opened the restaurant and conducted it at a loss till nearly the time when the bill was filed in this cause, when the business began to get on a paying basis.

Mench seems to have consulted the counsel for his firm in New York, and was there directed by counsel, and by the chief stockholders in defendant's corporation, to sign the lease, but, as he says in his affidavit, "by default and oversight" he neglected to do so. Mench's connection with the company was rather suddenly terminated shortly thereafter, and he was succeeded by Salomon as president. The bill alleges, and the court must accept the allegation as true, that Salomon was entirely familiar with the agreement between Mench and Koehler, was present at some of the negotiations and was informed of every step of the transaction.

Some time after Salomon became defendant's president, a correspondence started between him and Koehler, about a gas bill of the restaurant; Salomon contending that the contract between the two companies provided that defendant should pay only for illuminating gas, and Koehler arguing that, insomuch as no illuminating gas was used in the restaurant, the lighting being entirely by electricity, the contract necessarily referred to gas used for cooking purposes. As is not infrequently the case where business men conduct an argument by letters, instead of talking the matter over face to face, the correspondence started off in a most pleasant and friendly manner; then the tone of the letters became colder and colder, and finally wound up with Koehler demanding that Salomon sign the lease he had tendered Mench, and Salomon informing Mench that he had no lease, and giving him some 30 or 60 days notice to vacate.

The restaurant company then filed its bill of complaint, asking for a permanent and temporary injunction to prevent the plaintiff being dispossessed, and praying that, by equitable estoppel, the lease tendered Mench by Koehler either be treated as signed, or that by mandatory injunction Salomon be directed to sign the lease. To this the defendant filed a motion "to dismiss the original bill herein because the relief sought therein is based on an alleged oral lease for more than one year, which said oral lease, even if made, is void because it is for more than one year and not in writing, signed by the parties, as required by the statute of frauds of Tennessee, being section 3142 of the Code."

Other questions are raised by the bill of complaint, such as the sufficiency of the notice to vacate, the rule as to tenancies from year to year, etc.; but these are not necessary to discuss. The whole matter turns on the question of whether the doctrine of equitable estoppel, in Tennessee, can be applied by a court of equity, in contravention of the exact wording of the statute of frauds. It is true that plaintiff, by amendment to its bill, sets out the letters from Salomon to Koehler, as taking the case out of the statute of frauds; but that matter is easily disposed of, for the reason that these letters nowhere set out the details of, or indeed even recognize the existence of, the written, but unsigned, contract tendered Mench by Koehler.

### Contentions of the Parties.

(A) Plaintiff contends that, though the statute of frauds is applied very strictly in Tennessee, the doctrine of equitable estoppel is recognized and applied in proper cases involving the statute of frauds, and relies on Williams v. Conrad, 11 Humph. (Tenn.) 412; Patton v. McClure, Mart. & Y. (8 Tenn.) 333; Heiskell v. Cobb, 11 Heisk. (Tenn.) 638; White v. Motley, 4 Baxt. (Tenn.) 544; Woods v. McGavock, 10 Yerg. (Tenn.) 133.

(B) A federal court is bound to accept the interpretation which the state court has given to its state statute, but is not bound to accept the application which the state court has made of the doctrine of equitable estoppel, which is a matter of general law as to which this court is free to exercise its independent judgment. Plaintiff relies on, among others, the following cases: Town of Venice v. Murdock, 92 U. S. 494, 23 L. Ed. 583; Western Union Telegraph Co. v. Sklar (C. C. A.) 126 F. 295; Casserleigh v. Woods (C. C. A.) 119 F. 308; Whitney v. Hay, 181 U. S. 77, 21 S. Ct. 537, 45 L. Ed. 758; Town of Newbern v. National Bank (C. C. A.) 234 F. 209; Butler v. Douglass (C. C.) 3 F. 612; Loewe v. California State Fed. of Labor (C. C.) 189 F. 714.

(C) The doctrine of estoppel in pais is a growing doctrine, even in Tennessee, and every case must defend upon its own facts and circumstances. Hume v. Bank, 9 Lea (77 Tenn.) 728; Decherd v. Blanton, 3 Sneed (35 Tenn.) 373; Evans v. Belmont Land Co., 92 Tenn. 348, 21 S. W. 670; Electric Light Co. v. Coal Co., 99 Tenn. 371, 42 S. W. 19; Bloomstein v. Clees, 3 Tenn. Ch. 433.

Defendant contends: That in Tennessee equitable relief is given in cases involving the statute of frauds in only two cases: (a) Where one, by signing a false paper, at the same time induces the belief that it is a true one; and (b) by inducing the belief that the paper had been signed when in fact it had not. Hackney v. Hackney, 8 Humph. (Tenn.) 452. That the strict application of the literal wording of the statute of frauds and the rigid limitation laid down by the Supreme Court of Tennessee is a rule of property in this state, and so binding on the federal court. Goodloe v. Goodloe, 116 Tenn. 252, 92 S. W. 767, 6 L. R. A. (N. S.) 703, 8 Ann. Cas. 112.

(It is not necessary to quote the decisions that constructions of a state statute by the highest state court which constitute a "rule of property" are binding on a federal court. That proposition is true beyond dispute.)

Therefore I will confine this discussion to an examination of what the law in Tennessee is as regards the doctrine of equitable estoppel and the statute of frauds. The statute of frauds of Tennessee, section 3142 of Shannon's Code of 1917, is, so far as pertinent, as follows:

"*Promise or Agreement, When to be Evidenced by Writing.*—No action shall be brought * * * upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one year; or * * * unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized."

Under general principles of equity jurisprudence the facts as above set out make out a clear case of equitable estoppel. Not only has there been a part performance (which in most jurisdictions would relieve from the statute), but the plaintiff, at the express request of the defendant, and with the active assistance of defendant, and on its solemn as-

surance that the contract would be signed as written, except for formal changes, has materially changed its position by investing $11,000 in equipment, $2,000 or $3,000 in cleaning and renovating, and $7,000 in conducting the early stages of the business at a loss.

It was to relieve parties of the hardship of rigid legal rules, where their strict enforcement constituted an actual fraud, that courts of equity had their origin, and so in the beginning, unless there be a "rule of property" in Tennessee to the contrary, the plaintiff is entitled to the relief sought on the showing made in its pleading. This general rule is stated in Pomeroy's Equity Jurisprudence (4th Ed.) volume 2, § 921, as follows:

"The Statute of Frauds Not an Instrument of Fraud. It is a most important principle, thoroughly established in equity, and applying in every transaction where the statute is invoked, that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting, or aiding the party who relies upon it in the perpetration of a fraud, or in the consummation of a fraudulent scheme. This most righteous principle lies at the basis of many cases of equitable relief, among which are the specific enforcement of verbal agreements for the sale of land which have been partly performed, the reformation and enforcement of agreements and conveyances imperfect through fraud or mistake, the cancellation of fraudulent agreements and conveyances, and the like. One particular instance of relief will be mentioned as an illustration. Where an agreement has been verbally made which the statute requires to be in writing, and through the actual fraud of one party the execution of the written instrument is prevented, and the other party is induced to accept and rely upon the verbal agreement as valid and binding, a court of equity will not permit the fraudulent party to set up the statute of frauds as a defense, but will enforce the agreement against him, although it is merely verbal. Of course, there must be actual fraud as the distinguishing feature of the transaction,—something more than the mere omission to put the contract into writing. The plaintiff must be induced through the deceit, false statements, or concealments of the other party to waive a written instrument, and to rely upon the parol undertaking. The same relief, it seems will be given when the execution of a written contract, otherwise fully agreed upon, is prevented by an inevitable accident, as by the death of a party."

## Tennessee Authorities.

It is to be conceded in the outset: (1) That mere partial performance does not take an oral contract out of the statute of frauds in this state. (2) That this doctrine is so well settled in Tennessee as to constitute a "rule of property" binding alike on federal and state courts of equity. It is needless to cite the authorities on this proposition, as the question is thoroughly well settled.

But it by no means follows that where, in addition to partial performance, a party to the contract, at the request and with the active assistance of the other party, has changed his condition, and a loss would be put on him if the statute of frauds be involved, that a Tennessee court of equity will not apply the doctrine of equitable estoppel. Admitting the statute of frauds to be a wise and salutory act, and that a very liberal construction shall be given to it, and not a narrow and constricted one, I fail to see anything so sacrosanct about it that a court of equity is bound to allow it to be used as an instrument of hardship and oppression, verging on actual fraud.

Defendant relies on the case of Hackney v. Hackney, 8 Humph. (Tenn.) 451, for the proposition that the doctrine of equitable estoppel is limited to (a) where one signs a false paper, inducing at the same time the belief that it is a true one; and (b) by inducing the belief that the paper had been signed when it in fact had not been signed.

There were no facts in Hackney v. Hackney on which to predicate this drastic limitation of the power of a court of equity in cases of equitable estoppel, where the statute of frauds is involved. The wife filed a bill in chancery against the husband to enforce the specific performance of an oral promise made in consideration of marriage to settle certain property on her. This is a typical case of an oral promise unenforceable under the statute of frauds, and the court properly so held. The limitation to two classes of fraud of the doctrine of equitable estoppel as attempted by the court was dicta.

Three years later, in Williams v. Conrad, 11 Humph. (Tenn.) 412, the court discussed the doctrine of equitable estoppel in a case not falling under either of the two categories set out in the Hackney Case. The court said:

"The doctrine is well established in equity that, if a party by fraud or breach of a specific promise omits to do an act, or prevents an act from being done, equity treats the case, as to him and all others who may be placed in his stead, as if it were done, and

the other party is regarded as in the same situation as if the act had been done in the utmost good faith. * * * The statute of frauds has no application to a case where the agreement or declaration of trust was intended by the parties to be reduced to writing, but has been prevented from being done by the fraud or breach of promise of one of the parties. In such cases, the doctrine of a court of equity is that the agreement of trust shall be specifically executed, for the very forcible reason that otherwise the statute designed to suppress fraud would be the greatest encouragement and protection to fraud. * * * It is clear, therefore, that upon this ground the complainants cannot be repelled."

Conrad v. Williams is not only later than the Hackney Case, but its reasoning is more in line with the general trend of the law and in harmony with the general principles of equity jurisprudence.

As far as I can find, the Tennessee courts have uniformly refused to allow part performance to take an oral contract out of the bar of the statute of frauds; but there they have stopped. There is a great deal of dicta—much of it conflicting—as to equitable estoppel and the statute of frauds, but I can find no case where the Tennessee chancery courts have refused relief in a case whose facts would make the statute, literally applied, an instrument of hardship, oppression, and fraud. The contrary idea, though widely prevalent among the bar of Tennessee, is like the thoroughly grounded popular belief that it is a felony to strike a man who wears glasses; on investigation no such rule exists.

For instance, in Neal v. Cox, Peck (Tenn.) 443: This was a bill in equity filed to compel an executor, whose testator had made a verbal purchase of land before his death and was then in possession, but the executor had caused the lands to be conveyed to himself, to convey the lands to the heirs of the testator. The defense was that the verbal contract of the testator was void under the statute of frauds. The opinion is a learned discussion of the subject. In the course of the opinion, the court said:

"If in this case it be at all necessary to decide the question whether a court of chancery will, in any case governed by the laws of the state, decree the specific execution of a contract which has not been reduced to writing and signed by the party to be charged thereby, it is believed there are certain cases where such contracts ought to be executed specifically, although they have not been so reduced to writing nor signed. And, if it be asked, how far is this principle to be extended?

The answer is, just as far as it can be safely done, without incurring any of the evils intended to be guarded against by the statute, and no farther. * * * It is to be observed that there is a marked distinction between a case at law, where the statute is relied on to bar the plaintiff's claim, and a case in equity, where the same statute is relied on as a defense, because, in the former case, the establishment of the plaintiff's demand, or cause of action, if it be resisted, must rest altogether on the testimony of witnesses, who may be induced to commit perjury; whereas, in a court of chancery, you have the statement of the defendant on oath, who will not be likely to admit more against himself than is true. * * * Indeed, it is exceedingly doubtful if the framers of the British statute of frauds and perjuries had their attention at all turned to a court of equity, or if they meant anything more than to say that, where a person brought a suit in a court of law, in certain cases, that unless the contract on which he founded his action was reduced to writing, he should not be permitted to recover; it is very certain that the words of the act do not embrace proceedings in chancery, but it has been determined, and very properly, too, that proceedings in chancery are to be governed by the spirit of the statute. But what is the spirit of the statute? In other words, what did the framers of that statute mean, when they passed it? The answer is, they intended to prevent fraud from being perpetrated by the commission of perjury, or, in other words, they intended that persons should not be defrauded of their property by the oaths of false witnesses. But surely they never intended that, in a case where a contract was fairly and honestly made and could be established without any danger of the commission of perjury, that such a contract should not be enforced. * * * Suppose the framers of the statute had been asked, when they were about to pass it, if they intended to embrace such a law as this, what would the answer have been? It is believed they would have said no. Indeed, to give the statute that construction, would be perverting it from the use for which it was intended, that is, a shield to guard against fraud and perjury, and would be converting it into a sword with which to wound Justice in her own temple."

In holding that the defense was not available, the court in conclusion said:

"The defense set up by Reed Cox, that he would not enforce the payment of the balance of the purchase money from the executor, is not tenable, for, without determining whether

he could have done so in a court of law or. not, no doubt is entertained that, if he had filed a bill for a specific performance of the contract, and made the guardian party to that bill, he could have had the contract executed, if he had shown that he was ready and willing on his part to complete the same."

This is a painstaking and able discussion of the subject by the highest court of Tennessee. It certainly does not establish as a rule of property in Tennessee that a court of equity will never intervene to prevent the statute of frauds from being used as an instrument of fraud.

The case on which the defendant relies to establish the proposition that a strict construction of the statute of frauds is a rule of property in Tennessee is Goodloe v. Goodloe, 116 Tenn. 252, 92 S. W. 767, 6 L. R. A. (N. S.) 703, 8 Ann. Cas. 112. It was a suit by a nephew of deceased against the heirs of deceased to compel the specific performance of a verbal agreement entered into between complainant and deceased, by which deceased had agreed to leave a will giving him a farm and certain personal property if he would enter her employ and remain in her employ until her death. The bill also sought, as alternative relief, a recovery on the quantum meruit for the value of the services performed. There were no peculiar equities in the case, nothing to shock the conscience of the court, and a recovery on the quantum meruit fully and adequately compensated complainant for the services he had performed. Relief by specific performance was denied, but a recovery on the quantum meruit for the full period of the services was allowed. In denying specific performance, the court said:

"The contract relied upon was one resting in parol, and was therefore unenforceable. It is true, as insisted by complainant's counsel, that the weight of authority, English and American, is that part performance of a contract under the conditions disclosed in this record, will take the contract out of the operation of the statute of frauds; but as early as Patton v. McClure, Mart. & Y. 333, it was held that partial performance of a parol contract for the sale and conveyance of land would not relieve from the application of the statute. This rule then established has since been applied in a great number of cases, so that it may now be regarded as a rule of property in this state."

This was a simple case of part performance, with no difficulty in the way of restoring complainant to his original status. If it establishes a rule of property in Tennessee, it is only a rule to the effect that part performance in similar cases, standing alone, will not take a case out of the statute. It does not hold that a court of equity is powerless to grant relief where the facts justified it. It cites only Patton v. McClure, Mart. & Y. (Tenn.) 333. In that case the court had before it "nothing but the naked parol contract, without any price having been fixed upon for the 10 feet of ground, or any consideration having been paid therefor." In the Patton Case, the court held that it could not grant relief, because it would be making a contract for the parties, instead of enforcing one already made, "were we to execute this parol contract, where we have no knowledge, even from any parol proof in the cause, what consideration was to be paid to McClure for his property?"

Compare the dicta in the Hackney Case with the statement in Hume v. Bank, 9 Lea (77 Tenn.) 728, in reference to equitable estoppel: "It is a growing branch of the law, in which decided cases are of less value than usual, for the reason that every cause must depend upon its own peculiar facts and circumstances. As a general rule there must be word or conduct by one party, action based thereon by the other party, and injury to the latter to preclude the admission of evidence in conflict with the word or conduct."

And again in Decherd v. Blanton, 3 Sneed (35 Tenn.) 373, 375, as follows: "A much broader range has been given to the doctrine of estoppel in pais, by the recent decisions both in England, and in this country, than that which formerly existed."

Certainly "a growing branch of the law" would not be so described, if by a rule of property it is limited in cases involving the statute of frauds to two cases of fraud only, and is powerless to remedy other wrongs, however glaring, because they do not fall within the narrow classification set by a court in 1847 in the course of a general discussion of the effect of the statute of frauds.

The doctrine itself is aptly stated in Evans v. Belmont Land Co., 92 Tenn. 348, 365, 21 S. W. 670, 673, as follows: " 'Equitable estoppel, in the modern sense, arises from the conduct of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair

dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.' * * * Discussing the circumstances under which an equitable estoppel arises, Mr. Justice Swayne said: 'This remedy is always so applied as to promote justice. It is available only for protection, and it cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond that.' "

It is stated and applied in Tennessee Coal, etc., Co. v. McDowell, 100 Tenn. 565, 570, 47 S. W. 153; Electric Light Co. v. Gas Co., 99 Tenn. 371, 381, 42 S. W. 19, 21, in which case the court said:

"The doctrine of equitable estoppel, or estoppel in pais, is founded in natural justice, 'and is a principle of good morals as well as law.' 'The primary ground of the doctrine is that it would be a fraud in a party to assert what his previous conduct has denied, when, on the faith of that denial, others have acted.' * * * 'The vital principle is that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both.' Dickerson v. Colgrave, 100 U. S. 580 [25 L. Ed. 618]."

I cannot assent to the proposition that there is a fixed rule of law in Tennessee, which, as regards the statute of frauds, renders her courts of equity powerless to right wrong, and prevent the consummation of fraud.

There is no case—unless it be Hackney v. Hackney—which so asserts, and the whole spirit of Tennessee jurisprudence, as faintly reflected in the quotations supra, is to the contrary. As stated before, the Tennessee courts —properly, I think—refuse to let mere partial performance take an oral contract out of the statute of frauds, but I cannot find a single decision where the Tennessee courts have permitted fraud to be committed under the protection of a statute designed to prevent fraud.

In this case, as I said in the opening remarks, I am passing merely on the statements in the plaintiff's pleadings. The motion of the defendant to dismiss the bill of complaint is denied. The temporary injunction is granted.

Let an order to this effect be drawn and entered.