SNEED, J.,
delivered the opinion of the Court.
The complainant, as executor of the last will and testament of Ephraim King, deceased, brings his bill for the specific performance of a contract by the purchasers of the land and slaves of his testator, alleged to have been sold by him, under the directions of the will, on the 18th of February, 1862, and for an account of advancements, and the settlement of said estate. The defendants are the heirs and devisees of the testator, a part of whom were the purchasers of said land and slaves.
It is alleged in the bill, that the will, after disposing of some specific legacies, gave the entiré estate, both real and personal, to the testator’s widow, for life, and directed, after her death, the whole to be equally divided among “all the testator’s heirs;” . that, following the instructions of the will, the complainant, after the termination of the life estate, proceeded to sell the land and slaves to the highest bidder — the land on a credit of one and two years, and the slaves on a credit of one year from the date of the sale; that said land was composed of two tracts, one known as the home place, and the other known as the Cunningham tract, both lying in Lincoln County; that the same was sold in lots as follows: Of the home place, Lot No. 1, 175 acres and 38 poles, was sold to E. C. King, for $5,081.88; Lot No. 2, 138 acres, 138-J poles, to S. A. King, for $2,082.98. and Lot No. 3, 183 Acres, 120 poles, to Martha G. *563 Moore, for $5,512.50. Of the Cunningham tract, Lot No. 1, 138 acres, 139|- poles, to W. A. King, for $3,194.06; Lot No. 2, 201 acres, - 98 poles, to M. A. Harkins, for $3,024.18; Lot No. 3, 88 acres, 80|- poles, to A. J. King, for $1,681.56. The two negroes were sold to A. J. King and John Holly, the man, Green, for $1,050, to the former’, and Anthony for $950, to the latter. The only memorandum, or written evidence of the- sale of the land, is a certificate by the executor, made an exhibit to the bill, in the words and figures following:
“A list of the land and negroes sold at the residence of Ephraim King, deceased, sold as the property of the said Ephraim King, deceased, on the 18th day of February, 1862:
HOME PLACE.
Lot No. 1, 175 a., 38 poles, $29, E. C. King,...$5,081.88 Lot No. 2,138 a., 138J poles, $15, .S. A. King,... 2,082.98 Lot No. 3, 183 a., 120 poles, $30, M. Gi Moore,... 5,512.50
CTJNNTNG-HAM PLACE.
Lot No. 1,138 a., 139-| poles, $23, W. A. King,...$3,194.06 Lot No. 2, 201 a., 98 poles, $15, M. A. Harkins,... 3,024.18 Lot No. 3, 88 a., 80| poles:, $19, 'A. J. King,... 1,681.56 No. 1, negro boy, Green, $1,050, A. J. King,... 1,050.00 No. 2, negro boy, Anthony, $950, John Holly,... 950.00
“I certify that the above list is correct, to the best of my knowledge and belief. This, 7th August, 1865.
“James P. HudsoN, “Surviving Executor.”
It is alleged in the bill that all the purchasers took possession of the land respectively bought by them, and the slaves, and that they hold the land to the present *564 time, and the slaves were so held by the purchasers of them until the period of their emancipation. But only M. A. Harkins, S. A. King and John Holly executed their notes. W. A. King died not long after the sale, and without executing his notes for the purchase money. He left a widow, Theodosia, in possession of the land, and one child, Lauretta. The defendant, Joshua Gambrel, has since intermarried with Theodosia, and became the administrator of the estate of W. A. King. The bill further states that several of the purchasers will be unable to pay, and that the land will have to be re-sold, in order to realize the’ amount; that all the purchasers are directly or indirectly interested in said estate as devisees and heirs, or the widows or husbands of such, and having purchased in unequal amounts, an account is prayed, and an adjustment and settlement of said estate, and decree for balances.
The defendants, Joshua Gambrel, and wife, Theodosia, first answer. They admit all the allegations of the bill, the purchase by W. A. King, and the subsequent continued possession. They assent to the specific performance of the contract, and are willing to comply with the terms and conditions thereof as assumed by W. A. King in his lifetime. They insist that the land bought by the defaulting purchasers be re-sold, and if it do not bring as much as they bid, then that they be required to contribute the deficit; that, according to the intention of the testator’s will, the sale of the real estate was a conversion into personalty; and the said Joshua insists that the interest of the said W. A. King be paid over to him as administrator, and that the descendants of the child or *565 children of the testator who died before the termination of the life estate had no interest in the estate, but the whole belonged to the children living at the termination of said life estate.
The answer of John W. Barham, Nancy Barham and Lauretta King, minors, by their guardian ad litem, submits the rights of said wards, and claims for them and Lethe Foster, and another, whose name is not given, all minors and descendants of the testator, one-eighth of said estate, to three-fourths of which the three first named minors would be entitled. It insists that all the heirs of the testator had an interest in the estate devised in remainder, which vested at his death, and that Lauretta had inherited all the rights of her father in said purchase, subject to the dower of her mother, Theodosia.
The answers of E. 0. King, and G. W. R. Moore and wife Martha, admit the sale, purchase and possession, as charged in the bill, but resist the enforcement of the contract, upon the ground that the • land was sold during the late civil war, at “Confedérate prices,” which were based upon fictitious values, and that they bid them off at largely more than their value, in order to secure homes near the old family homestead; that they are now poor, and utterly unable to pay the amount bid for the land, and interest, and that if compelled to do so they will be deprived of all share in the estate of their father; and in view of the changed condition of the country, the general impoverishment of the people, and of the peculiar circumstances under which the purchase was made, with the impression, it is stated, that the land would be paid for in the abundant currency of the time, they pray *566 to be relieved of the purchase, avowing their willingness to pay the rent while the land has been held by them; that said sale was made under an usurped government, whose acts had been declared null and void by the Constitution of 1865, and that the Court could not lawfully enforce said contract upon them. They ask a re-sale, and an adjustment of all accounts between the devisees and the executor.
The answer of S. A. King admits the purchase and possession, as charged, and the execution of his note for the purchase money, and insists upon the specific performance, as prayed for in the bill, as against himself and all others. He avows his readiness to comply with the terms of the Contract, and prays for a general account and settlement of the estate.
Neither of the purchasers of the land, who resist the bill, rely upon the statute of frauds as a defense, in their answer.
The defendant, John Holly, and wife, file an answer and cross bill. They admit the purchase of the slave, Anthony, the execution of the note, and that they took possession of him under their purchase, and held him until public events had made him free. They insist that the executor made a bill of sale to the slave, expressly reserving in himself the title until the purchase money was paid; that he, the said John Holly, tendered the price at the maturity of the note, but the complainant declined it, and refused to make him a title. They charge in the cross bill, that the complainant was guilty of great negligence in attending to the affairs of said estate; that he was slow to enter upon the duties of his trust, and *567 that he postponed the sale of said slaves until the country was convulsed in civil war, and that slavery was on the eve of its extinction, as complainant knew, when said slaves were sold; and that in view of the peculiar hardship of the case, their own poverty and litter inability to pay, they pray to "be relieved from said sale, and that the same be declared void as to them, because no title had vested in them.
The complainant answers the cross bill, denying all its charges. He states that there was no lien reserved, and that the title passed to the said John Holly by the sale and delivery and bill of sale; that the said Holly, on his purchase, took the title, possession and risk of the property, and that he retained' no lien upon said slave.. He denies the alleged tender of the money, but states that the said Holly did once propose to him to exchange the bill of sale for his note, but he declined. The bill of sale is not exhibited, and there is no proof in the cause.
The Chancellor held the sale of the land and negroes to be a valid sale, and decreed, a specific performance of the terms thereof. An account is ordered against the purchasers, and against the executor, as to the debts and assets of the estate, and a settlement of all matters between the heirs and devisees and the executor, allowing due compensation to the latter, and an account of solicitor’s fees. In construing the will, which is not exhibited in the record, the Chancellor held that the intention of the testator was to convert all his property into money, and thus to have it distributed among his heirs and legatees, upon the termination of the life estate; that all the living children and descendants of deceased children were *568 entitled to share in the estate, the children in equal parts, and the descendants of deceased children as classes, each of which would represent their deceased parent, and the great grand-children taking as a class the interest of their deceased parents; that the share of W. A. King be paid to Joshua Gambrel, his administrator, to be administered according to law, or applied to the indebtedness of the estate of the said ~W. A. King to the estate of the testator.
. The defendants, E. C. King, G. W. R. Moore and wife, Martha, and John Holly and wife, Mahala, presented, after the decree, a petition for re-hearing,' setting forth the great hardship of the case as against them, in view of all the circumstances, and relying upon the statute of frauds as a defense against said bill, so far as it sought to enforce said contract for land. The prayer of the petition was disallowed, and the petition dismissed. The defendants appealed, but only the defendants King and Moore and wife gave bond.
The will is not copied into the transcript, and we can not, therefore, judge of the correctness of that part of the Chancellor’s decree which interprets the intention of the testator as to the manner of the transmission of his estate.
But in other respects, there must be a modification of the decree.
The jurisdiction of a court of equity, in decreeing a specific performance of an agreement, is a peculiar jurisdiction, in the exercise of which that forum becomes, of its own inherent strength, a court of conscience. It is said that equity follows the law, and this proposition is abstractly *569 true; but, in the exercise of this jurisdiction, it sometimes, says Mr. Justice Story, “goes far beyond the law:” 2 Eq. Jur., § 741. It was a remark of Lord Redesdale, that the ground of this jurisdiction in a court-of equity, is in its capacity to do complete justice: Harnett v. Yielding, 2 Sch. & Lefr., 552. The court of equity, in the exercise of this jurisdiction, would fall far short of its functions and its duties alike, if it; did not take a broader view of the rights of parties than is sanctioned by the sterner rules of the common law. It is said to be “a discretionary jurisdiction,” not, indeed, of arbitrary or capricious discretion, dependent upon the mere pleasure of the Judge, but of that sound and reasonable discretion which governs itself as far as it may, by general rules and principles; but at the same time, which withholds or grants relief according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties: 2 Story Eq. Jur.; § 742. And it is stated by Lord Redesdale' to be one of the special grounds why a court of equity will not decree a specific performance of an agreement, when, from the circumstances, it is doubtful whether the party meant to contract to the extent that he is sought to be charged: 2 Story Eq., § 716, note 1. If such was a recognized doctrine of English jurisprudence in the beginning of the present century, with much more force may we apply it to transactions occurring during the late war, if indeed we could not evoke from that extraordinary period some broader and more catholic doctrine fairly deducible from the great principles of equity jurisprudence. We hold that, in adjust *570 ing the rights of parties which accrued to them during the late civil war, we can not, consistently with the principles which give life and spirit to a court of equity, close our eyes to the circumstances which then surrounded them. In the language of Chief Justice Chase, “contracts made among them must be interpreted and enforced with reference to the condition of things created by the act of the governing power:” 8 "Wal., 13. We can not ignore the existence of a rampant and bloody revolution, which pervaded all civil society and unsettled, the courses and currents of social, commercial and domestic life. We can not close our eyes to the fact' that, in that struggle, the energies of trade, naturally elastic, were paralyzed by the perils which beset our people by land, and by the blockade of our seaports; that this state of things had destroyed our standard of values, and commerce itself became the foot-ball of military caprice. We can not forget that there was no money, silver, gold or bullion, by which to measure the values of trade and commerce, and that the fortunes of war had forced upon the people a plethora of currency of an arbitrary commercial value, with which they built their navies, marshaled their armies, carried on a gigantic war, while for four years their own internal commerce had no other basis, no other standard of value; that this currency was their money, their gold, their silver, their all; that it supplied them with raiment. It bought their daily bread. It supported the living; it buried the dead. It paid their soldiers, their farmers, their mechanics, their teachers, their doctors, and it was the basis of all their contracts. We can not forget that the country was full of this re- *571 dunclant currency, whose circulation was enforced by public opinion and military power, and that the very plethora of this circulation had given a fictitious value to every article of trade and every species of property, both real and personal. Nor could a court of equity, in such case, shut out the picture of desolation, of broken fortunes, of ruined homesteads, of scattered and impoverished families, and the heavy burden of utter, bankruptcy and gloom which, at the close of the late civil war, rested upon the country. The defendants who resist the prayer of this bill, have, by the ground of their defense, brought these considerations squarely before us; and we have no hesitation in laying it down as a -principle, that courts of equity in determining the rights of parties in a case of this kind, should interpret those rights by the light of surrounding circumstances, and with reference to the motives, hopes, prospects and conditions under which the transaction occurred where it can be done without too great a departure from well-established principles. The parties have not specially relied on the statute of frauds in their pleadings as a defense against this bill. Yet, in a case like this, we could not allow a technical rule to defeat the demands of substantial justice. In view of the imperative terms of the statute, we hold that, irrespective of the pleadings, no court could enforce a contract' of this nature, if void under the statute; nor could any court legally entertain such an action, unless, perhaps, in the case where the adverse party has acquiesced in the enforcement of the agreement, or has in some way es-topped himself from resisting it by having accepted the whole or a partial benefit under it: 14 Johns., 15; 1 *572 Johns., Ch. 273; 2 Bouv. L. H., 323. No action shall be brought, says the statute, whereby to charge any per? son, upon any contract for the sale of lands, tenements or hereditaments, * * * unless the promise or agreement upon which such action shall be brought, or some memorandum or - note thereof shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized: Code, 1758. We apprehend that the object of the statute would be met if the memorandum were sufficiently specific to enable the officers of the court to go into the country and find the land, and enforce its decrees against it. An old English case is sometimes referred to, where the conveyance was of “a farm in the tenancy of A,” without any further description; and the Court held the memorandum sufficient. Sheph. Touch. But the course of decisions in Tennessee has not favored this loose construction of the statute. Judge Catron regretted that the statute had been so far departed from in the English decisions. He said it had been followed by an “appalling train of litigation” in that country; and he cited it by way of warning to the courts of this State not to fall into the same error: Patton v. McClure,, M. & Y., 344. The objects of the statute, said Story, are such as its very title indicates, “to prevent the fraudulent setting up of pretended agreements, and then supporting them by perjury. Another object was, to preserve the terms of the contract in some enduring and exact form, not dependent upon the frailty or the honesty of human witnesses. And courts of equity, before the passage of the Act of Car. II, c. 3, always *573 refused to decree a specific performance of parol contracts, unless confessed in the answer, or unless they were already partly performed: 2 Story Eq., Jur., § 753. By the same authority it is said that courts of equity will enforce the specific performance of a contract within the statute, not in writing, when it is fully set forth in the bill, and is confessed by the answer of the defendant. The reason, says Judge Story, is, that the statute is designed to guard against peijury and fraud, and in such case, there can be no danger of that sort. Perhaps, says he, another reason might fairly be added, and that is, that the agreement, originally by parol, is now in part[1] evidenced by writing, under the signature of the party, which is a complete compliance with the terms of the statute: 2 Story Eq. Jur., § 755; Sneed v. Bradley, 4 Sneed, 301. It is immaterial under the statute as to the form of the instrument or the time of its execution, or as to the number of papers which, connected together, make out the memorandum, if they inherently show it without the necessity of resorting to parol evidence to identify the land and explain the contract. It may be executed at any time after the contract and before the action. It is doubted whether it might not be after the action brought, because the statute only means to secure written evidence of the contract. The general rule is stated thus: “It must contain the essential terms of the contract, expressed with such a degree of certainty that it may be understood without recourse to parol evidence to show the intention of the parties.” Brown on Frauds, §§ 348, 371.
*574 We hold that the memorandum of the sale of the land in this case is not sufficient under the statute of frauds, and that consequently the sale of the land on the 18th of February, 1862, was a nullity, if this be the only written evidence of it. Upon the other considerations discussed, involving the jurisdiction of a court of equity in decreeing the specific performance,’ even of a void contract, all parties assenting, we would have no difficulty in so pronouncing in this case as to some of these parties, but for the fact that they invoke in their answer the aid of the Court in enforcing the contract against all the others, while they consent to such enforcement as to themselves. Under these circumstances, if we can not enforce it as to the parties objecting, we ought not to enforce it against those assenting, as they deprecate that result in their answers, and it might, jaeradventure, operate harshly as to them. Though the parties objecting have not relied in their answers upon the statute of frauds, yet a court of equity will always snap the cords of a mere technical restraint, when it stands in the way of substantial justice. There are cases in which parties must specially plead the statute, or specifically rely on it in their answer; but we are not sure that this is one of them. This court has laid down a rule upon this doctrine of specific performance, which is of general application, that “a specific performance of a contract will not be decreed when it is hard or unreasonable in itself, or when, from mutual change of circumstances since the contract, the performance would be attended with particular hardship: McCarty v. Kyle, 4 Cold., 349. These parties have represented such to be the *575 effect of this enforcement, in their sworn answers. The complainant has chosen to present his case without proof; and even if the memorandum of the contract were above suspicion, a court of equity would hesitate long in such a case.
The sale of the real estate will be set aside, and the executor will re-scll the same in pursuance of the will. The notes executed for purchase money will be surrendered for cancellation. The purchasers of the slaves will be required to pay for them. In such case, the law is well settled in this State. The purchasers of the land will be required to account for rents, and be entitled to credit by the value of all permanent improvements. The costs of the cause will be paid by the executor out of the funds of the estate; and in all other respects, except as hereinbefore indicated, the decree of the Chancellor will be affirmed. With these modifications, the cause is remanded for further proceedings.

 Qu., “fact?”