THOMAS G. PRICE and THOMAS G. PRICE, JR., d/b/a PIKEVILLE COAL COMPANY, Plaintiff-Appellant, v. TENNESSEE PRODUCTS & CHEMICAL CORPORATION, Defendant-Appellee. —385 S.W.(2d) 301.

Middle Section. May 18, 1964.

Rehearing Denied July 31, 1964.

Certiorari Denied by Supreme Court December 9, 1964.

Raymond A. Graham and W. N. Dietzen, Chattanooga, Dietzen, Graham & Dietzen, Chattanooga, of counsel, for appellant.

A. A. Kelly, South Pittsburg, Robert G. McCullough and D. L. Lansden, Nashville, Waller, Lansden & Dortch, Nashville, of counsel, for appellee.

CHATTIN, J. Thomas G. Price and Thomas G. Price, Jr., a partnership, doing business as Pikeville Coal Company, brought this suit in the Circuit Court of Marion County, Tennessee, for the breach of a contract or a mining lease against the defendant, Tennessee Products & Chemical Corporation.

It was alleged in the declaration the parties had on February 2, 1959, entered into an agreement whereby defendant agreed to sublease to plaintiff a portion of the lands defendant had under lease from the United States Steel Corporation; that the purpose of the lease was plaintiff would strip and auger mine the coal in the land; that defendant would furnish to plaintiff maps at six months intervals which would designate the areas to be mined during the ensuing six months period and these maps were to be attached to and become a part of the lease; that prior to March 3, 1961, plaintiff had moved its equipment to the area leased and stripped and auger mined the area so designated and was preparing to move

to an area known as Kelley's Creek which defendant had orally designated as the next area to be mined, when defendant advised plaintiff that plaintiff could not mine Kelley's Creek; that W. J. Travis and Carl McFarlin, Jr., authorized officials of the defendant Corporation, orally agreed plaintiff could mine the Kelley's Creek lands; that plaintiff, relying on the oral agreement, purchased special equipment for the purpose of mining these lands; and that by reason of the breach plaintiff lost the profit which plaintiff would have realized if the area had been mined.

Defendant filed pleas of nonassumpsit, nil debit, non est factum, the statute of frauds and perjuries in that the written lease and subsequent oral agreement were void for lack of a sufficient description of the lands involved; that plaintiff breached the contract sued upon by carrying on substandard mining; and that plaintiff was not entitled to maintain the suit because of plaintiff's failure to procure a license to operate a mine in violation of T.C.A. secs. 58-115, 58-116 and 58-117, or a privilege license to sell coal as provided by T.C.A. sec. 67-4202 and T.C.A. sec. 67-4203(25).

The trial court, at the conclusion of plaintiff's proof, sustained defendant's motion for a directed verdict and dismissed the suit.

Plaintiff has perfected an appeal in the nature of a writ of error and has assigned as error the following:

"(1) The Agreement to Mine Coal is not within the Statute of Frauds;

"(2) The area was described in written instruments signed by the Defendant;

"(3) The written agreement of the parties incorporated by reference a recorded lease that described the area by metes and bounds;

"(4) The defendant was estopped to question the validity of the contract because it had assured the Plaintiff that it could mine the Kelley Creek Area and induced the Plaintiff to thereafter spend thousands of dollars for special equipment to mine the coal in this area, which the Plaintiff was not otherwise obligated to do and which it would not have done except for the assurance and inducements of the Defendant."

■ It is necessary we review the evidence in the most favorable light of plaintiff's theory of the case since we are bound by the following:

■ "In considering the propriety of the action of the Trial Judge in directing a verdict, we are to look to all the evidence, to take as true the evidence for the Plaintiff, to discard all countervailing evidence, to take the strongest legitimate view of the evidence for the Plaintiff, to allow all reasonable inferences from it in his favor, and if then we conclude that a verdict for Plaintiff would have been warranted by the evidence, the motion for peremptory instruction should have been denied and the action of the Trial Judge in granting the motion, was reversible error." T. H. Hayes & Sons v. Stuyvesant Insurance Company, 194 Tenn. 35, 250 S.W.(2d) 7.

The agreement upon which this suit is based was executed by the parties on February 2, 1959. At the time of its execution the defendant, Tennessee Products, was the holder of a lease from the United States Steel Corporation of some 24,075 acres of land lying in Marion, Grundy

and Sequatchie Counties as shown on a map attached thereto. This lease provided Tennessee Products could mine all the coal in the lands in accordance with the best practice in that industry. Tennessee Products was required to submit to the lessor for its approval projections of all mining operations showing the location of all proposed openings, entries, haulageways and other work sixty days prior to proceeding with the proposed operations. The lease further provided in the event Tennessee Products failed to mine the coal to the satisfaction of the lessor after thirty days notice of such failure, the lessor would have the right to terminate the lease.

We quote the first paragraph of the agreement entered into by the parties on February 2, 1959, since we think it is pertinent to the issues for our determination.

"AGREEMENT made and entered into on this the 2nd day of February, 1959, between TENNESSEE PRODUCTS & CHEMICAL CORPORATION, a Tennessee corporation, with principal office at Nashville, First Party, and PIKEVILLE COAL COMPANY, a partnership composed of Thomas G. Price and Thomas G. Price, Jr., with principal place of business in Pikeville, Kentucky, Second Party,

"WHEREAS, First Party is the holder of a lease dated the 7th day of January, 1955, under the terms of which it has leased from United States Steel Corporation certain lands for the purpose, among other things, of mining coal therefrom and said lease is now in full force and effect and authorizes First Party to sublease any of said lands; and

"WHEREAS, Second Party is engaged in the business of augering and strip mining coal and has adequate machinery and equipment for such purpose;

"NOW, THEREFORE, it is mutually agreed as follows:

"1. First Party hereby leases to Second Party, subject to the terms, provisions and conditions hereinafter set forth and further subject to the terms and conditions of the aforesaid underlying lease from United States Steel Corporation to First Party, the portion of the land marked in red on the map attached hereto, for the purpose of strip or open pit mining and auger mining.

"Second Party shall mine the area shown on said map in the order designated by the chief engineer of First Party and shall mine only such portions of said area as are listed upon an attached sheet and agreed upon and incorporated in this lease by reference.

"First Party at six months' intervals during the time of this lease shall designate sufficient area to be mined by Second Party during the next six months and such designation shall be attached hereto and become a part of this lease, and Second Party shall not strip or auger outside of said designated area. First Party will furnish at its expense section maps in duplicate, scaled $1'' = 100'$ covering crop line to be mined for each six months' period, showing areas to be skipped for any purpose, and will furnish maps required by State or Federal authorities."

The remaining parts of the agreement may be summarized as follows: Plaintiff agreed to mine the coal by the strip or auger method, depending upon which was the most economical at the time; and to perform such mining in the most effectual and workmanlike manner in order to recover the greatest amount of merchantable coal. Plain-

tiff also agreed to comply with the laws of this State and of the Federal Government regulating the management and operation of coal mines "in accord with the terms and conditions of the lease between First Party and United States Steel Corporation, which lease is by reference made a part hereof."

Plaintiff agreed to pay defendant the market value of any timber removed by its mining operations.

Plaintiff agreed to construct necessary roads from the public highways to the site of its operations.

Plaintiff agreed to pay lessor a royalty of eighty cents per ton for the coal mined.

Plaintiff represented that it owned sufficient machinery and equipment to produce a minimum of twenty thousand tons of coal per month; and, in the event the machinery, as listed in the agreement, was insufficient to produce that quantity of coal a month, plaintiff would acquire the necessary additional machinery and equipment.

Defendant agreed to haul the coal produced by plaintiff from the area of production to its tipple in Whitwell or cause the same to be done at cost of not more than eighty-five cents per ton of two thousand pounds.

It was agreed the agreement would take effect upon the notification of an award by the Tennessee Valley Authority under Requisition No. 23 to plaintiff; and that the agreement would continue in effect for three years or until the agreement or future agreements had been performed.

Mr. W. J. Travis, at the time of the execution of the

contract between plaintiff and defendant, was the manager of the mines and properties of the defendant.

Mr. J. C. Kelley was, at the time of the execution of the contract, the chief engineer for the defendant.

Mr. Travis stated in his deposition that he and Mr. Kelley discussed the contract with the Prices and went over the properties with them prior to the execution of the contract. Subsequently, the contract was executed by the parties at the Nashville office of the defendant.

He stated after the execution of the contract a map was furnished plaintiff showing all the property defendant had under lease from the United States Steel Corporation.

He further testified he had discussed the contract with the proper officials of the Tennessee Coal & Iron Company, a subsidiary of the United States Steel Corporation, and that the proper official of that company had written a letter to defendant authorizing the execution of the contract between plaintiff and defendant for strip and auger mining of the leased properties; provided corridors were left in virgin coal areas for future underground mining operations and projection maps were furnished Tennessee Coal & Iron Company showing the strips to be mined in the virgin areas and corridors to be left for future underground mining.

He stated plaintiff began its mining operations in April, 1959, in an area known as the Pocket. Subsequently, plaintiff moved to an area known as Griffith Creek and later to an area known or designated as Woodcock Gulf. He testified a map showing the portion of each of these areas to be mined was furnished by plaintiff as provided by the contract or lease.

He further testified that about six months prior to plaintiff completing mining operations in Woodcock Gulf he and Mr. J. C. Kelley had orally agreed plaintiff could move its mining operations to an area known as Kelley Creek which area contained virgin coal. But some time later the Tennessee Coal & Iron Company notified defendant it would not permit plaintiff to mine the Kelley Creek area. Both he and Mr. J. C. Kelley conveyed this decision of Tennessee Coal & Iron Company to plaintiff while plaintiff was still carrying on its operations in the Woodcock Gulf area.

Mr. Thomas G. Price, Jr., testified he and his father, Thomas G. Price, were shown the properties of defendant by Mr. Travis and Mr. J. C. Kelley prior to the signing of the lease.

He stated defendant made no objection to their mining operations in the Pocket, Griffith Creek, and Woodcock Gulf areas. That while mining the Woodcock Gulf area plaintiff was told by the officials of the defendant, Travis and Kelley, the Kelley Creek area would be the next area to be mined. Later plaintiff was notified the Tennessee Coal & Iron Company would not permit the plaintiff to mine that area.

He further testified, relying upon the oral assurance of the officials of the defendant the Kelley Creek area would be the next area to be mined after completing the mining of the Woodcock Gulf area, plaintiff purchased additional mining equipment to mine that area. He stated this equipment cost in excess of $100,000.00 and plaintiff lost what equity plaintiff had acquired in the equipment due to the breach of the agreement.

Mr. Thomas G. Price testified substantially as his son that no question was made of the manner and methods

used in plaintiff's mining operations. Nor did defendant ever insist plaintiff's operations were substandard.

He also stated defendant through its officials orally agreed that plaintiff could mine the Kelley Creek area after completing the operation in the Woodcock Gulf area but later refuted this oral agreement; and that plaintiff had purchased equipment which cost about $90,000.00 in anticipation of mining the Kelley Creek area.

He further testified coal was selling at the time for $5.08 per ton, and the cost of producing a ton of coal and delivering it to the purchaser was $3.95.

Mr. Carl McFarlin, Jr., Vice President of the defendant Corporation, testified he was in charge of the affairs of the Corporation when the contract with plaintiff was executed.

He stated the operations of plaintiff were satisfactory to defendant and no complaint for substandard mining was ever communicated to plaintiff by defendant.

He also testified defendant on April 30, 1959, entered into a contract with Paul Gibbs to haul all coal mined by the Pikeville Coal Company under the contract with defendant and haul it to defendant's ramp at Whitwell, Tennessee. We quote only the parts of the contract which we think are pertinent to the issues, to-wit:

"This contract and agreement made and entered into as of April 30th, 1959, by and between Tennessee Products & Chemical Corporation, of Whitwell, Tennessee, hereinafter called First Party, and Paul Gibbs, of Tracy City, Tennessee, hereinafter called Second Party,

## WITNESSETH:

"Whereas, heretofore First Party has entered into a contract with Pikeville Coal Company for the removal of coal from certain of its leasehold lands by the strip and auger mining method; and,

"Whereas, it is necessary that said coal so mined by said Pikeville Coal Company shall be transported from the various sites and points of production to points of delivery to First Party; and,

"Whereas, Second Party is in position and equipped with sufficient trucks to haul and deliver all the coal so mined by said Pikeville Coal Company:

"Now, therefore, this contract is now made and entered into by and between the parties hereto upon terms, provisions and conditions as follows:

"1st. Second Party agrees that, at all times during the life of this contract he will keep, own, or possess for use, a sufficient number of trucks and drivers to haul and deliver all coal mined and produced at the various sites or points of operations of said Pikeville Coal Company, and to keep said coal collected, loaded and in transport so as to cause no delay or cessation of operations by said Pikeville Coal Company.

"2nd. For the collection, loading, hauling, delivering and unloading of said coal, from various points of origin to various points of destination, First Party agrees to pay unto Second Party tonnage rates as follows:

636

| POINTS OF ORIGIN | POINTS OF DESTINATION | PRICE PER TON |
|---|---|---|
| (a) Area between Victoria Point and North end of Floyd Hollow | to Whitwell ramp | $0.85 |
| (b) Area between No. 1 Mine and Griffith's Creek | to Whitwell ramp | $0.65 |
| (c) Area between Griffith's Creek and Kelly's Creek | to Whitwell ramp | $0.80 |
| (d) Area between Kelly's Creek and Woodcock Gulf | to Daus ramp | $0.75" |

The witness testified further the area between No. 1 Mine and Griffith Creek, the area between Griffith Creek and Kelley Creek, and the area between Kelley Creek and Woodcock Gulf would include all the outcrop of the Kelley Creek area under lease to defendant from United States Steel Corporation.

Mr. Roy Crawford, Jr., a professional mining engineer, testified he measured the entire outcrop of coal in the Kelley Creek area and found it to measure 80,150 linear feet. He stated each lineal foot of outcrop would produce at least nine tons of coal.

It is undisputed that a map with a portion marked in red to denote the land to be mined was never attached to the lease.

Plaintiff's first assignment of error presents the question of whether the contract was a lease or merely a contract to mine coal for defendant.

Plaintiff insists the agreement is a contract to mine coal for defendant and not a lease; and, therefore, the statute of frauds has no application.

■ But we are unable to agree. We think it is obvious the agreement is a lease. The writing gives the plaintiff the right to mine the coal and sell it. It also provides the plaintiff may remove the timber necessary to its opera-

tions, sell it, and pay defendant the market value of the timber. The contract provides the plaintiff may construct all necessary roads upon the property.

Furthermore, we agree with the insistence of defendant, plaintiff is estopped to insist in this Court the contract is an agreement to mine coal for defendant. The record shows it was the insistence of plaintiff at the trial the contract was a lease. At no time did plaintiff insist otherwise in the trial court. In plaintiff's motion for a new trial no such insistence was made to the trial judge.

"When a cause is brought up for appellate review, a party cannot assume an attitude inconsistent with, or different from, that taken by him at the trial, and is restricted to the theory on which the cause was prosecuted or defended in the court below. Accordly, where both parties act on a particular theory of the cause of action, they will not be permitted to depart therefrom when the case is brought up for appellate review. The same rule governs where the parties act on a particular theory of defense or of opposition thereto." 4 C.J.S. Appeal and Error, sec. 241, page 719; Turner v. Zager, 50 Tenn.App. 674, 363 S.W. (2d) 512.

Accordingly, we overrule the first assignment of error.

By plaintiff's second assignment of error it is insisted the trial judge was in error in failing to hold the lease from the United States Steel Corporation and the contract between defendant and Gibbs sufficiently described the Kelley Creek area and thereby furnished the necessary description of the lands to be mined in writing.

While it is true "the memorandum required by the statute of frauds may be two or more papers" signed by

the party to be charged. Williams v. Buntin, 4 Tenn.App. 340. And, also, the memorandum "may be executed any time after the contract and before the action." Hudson v. King, 49 Tenn. 560. Yet it must be remembered "the meaning of the statute is to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other, and, therefore, both in this Court and in the courts of the common law, where an agreement has been reduced to such a certainty, and the substance of the statute has been complied with in the material part, the forms have never been insisted upon." Welford v. Beasley, 3 Atk. 503; Cobble v. Langford, 190 Tenn. 385, 230 S.W.(2d) 194.

The contract is certain as to all matters except the description of all the portion of the lands to be mined. The lease from the United States Steel Corporation describes the Kelley Creek area by metes and bounds. The contract between defendant and Gibbs does not specifically describe the Kelley Creek area but it is shown by parol evidence this area is embraced within the areas between No. 1 Mine and Griffith Creek, Griffith Creek and Kelley Creek, and Kelley Creek and Woodcock Gulf as set out in this contract.

But we do not think the description of the Kelley Creek area as set forth in these two instruments or either of them satisfies the statute, since it is plain from the record it was not contemplated by the parties the entire Kelley Creek area was to be mined, but on the contrary only such portions of the land marked in red on the map attached "as are listed upon an attached sheet and agreed upon and incorporated in this lease by reference." Thus, the descriptions in the two instruments referred to do not locate the portions of the Kelley Creek area to

be mined in accordance with the lease and the oral agreement, and, therefore, the descriptions are insufficient to satisfy the statute of frauds. Shield v. Stamps, 34 Tenn. 172; Johnson v. Kellogg, 54 Tenn. 262, 264; Campbell Farmers Co-op. v. Moore, 202 Tenn. 215, 303 S.W.(2d) 735; Parsons v. Hall, 184 Tenn. 363, 199 S.W.(2d) 99.

We overrule the second assignment of error.

By the third assignment of error, plaintiff insists the trial judge was in error in failing to submit the issue of whether defendant was estopped to plead the statute of frauds to the jury since there is material proof in the record plaintiff purchased additional mining equipment pursuant to the oral promise plaintiff could mine the Kelley Creek area.

■ Conceding, but not deciding, there is material testimony in the record from which a jury could find plaintiff had established the elements of the doctrine of estoppel which would preclude such a plea by defendant, plaintiff does not seek by that doctrine to protect its rights under the lease and the subsequent oral agreement. To the contrary, plaintiff seeks to create a right by that doctrine.

It was plaintiff's theory, both in the declaration and the proof in support thereof, that plaintiff was entitled to damages the measure of which was the loss of profits on the entire deposit of coal in the Kelley Creek area. Thus, plaintiff did not seek to protect plaintiff's right to mine portions of the Kelley Creek lands or to recover damages in lieu of that right, but seeks to create the right to recover damages for loss of profits plaintiff may have realized from mining and removing all the coal in that area by the doctrine of estoppel.

 The doctrine of estoppel may be urged to protect a right, but never to create one. Henry County v. Standard Oil Company, 167 Tenn. 485, 71 S.W.(2d) 683, 93 A.L.R. 1483; Melton v. Anderson, 32 Tenn. App. 335, 222 S.W.(2d) 666; Couch v. Couch, 35 Tenn.App. 464, 248 S.W.(2d) 327.

"This remedy is always so applied as to promote justice. It is available only for protection, and it cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond that." Dickerson v. Colgrove, 100 U.S. 578, 580, 581, 25 L.Ed. 618; Evans v. Belmont Land Company, 92 Tenn. 348, 21 S.W. 670.

We are of the opinion the trial judge was eminently correct in directing a verdict in this case.

Having reached the foregoing conclusions, we do not think it necessary for us to discuss defendant's insistence plaintiff could not maintain this suit because plaintiff had failed to procure a license to operate a mine or sell coal in this Sate prior to the institution of the suit.

All assignments of error are overruled and the judgment of the trial court is affirmed with costs.

Shriver and Humphreys, JJ., concur.

On Petition to Rehear

CHATTIN, J. Appellant has filed a petition to rehear complaining of our holding that the instrument sued on in this case was a lease; and that plaintiff could not invoke the doctrine of estoppel to create a right to recover damages for loss of profits plaintiff may have realized from mining all the coal in the Kelley Creek area since the lease and the subsequent oral agreement provided plaintiff could only mine portions of that area.

We gave our reasons for holding the contract was a lease in our original opinion.

In support of this phase of the petition able Counsel make an earnest argument, but it is only a re-argument of matters made by them and considered and determined by us. It does not point out any new matter of law or fact overlooked, but reargues things which Counsel say we improperly decided.

"The office of a petition to rehear is to call the attention of the court to matters overlooked, not to those things which the counsel supposes were improperly decided after full consideration." Louisville & N. Railroad Company v. United States Fidelity & Guaranty Company, 125 Tenn. 658, 148 S.W. 671; Black v. Love and Amos Coal Company, 30 Tenn.App. 377, 206 S.W.(2d) 432.

It is next earnestly insisted we were entirely wrong in our interpretation of the written instrument as to the areas to be mined.

However, we are convinced we were right in our interpretation. On page five of our original opinion we quoted from the written instrument which states in unambiguous terms that defendant was to designate the portions of the lands to be mined and the "areas to be skipped for any purpose."

On page seven of our opinion we set forth the testimony of plaintiff's witness, W. J. Travis, who stated it was understood corridors were to be left in virgin coal areas for future underground mining operations. The proof shows the Kelley Creek area was a virgin coal area and we so stated on page eight of our opinion.

In the alternative plaintiff requests us to reverse and remand the case so plaintiff, "might amend his suit in the trial court to seek a reformation of the writing to include and attach the maps and the list showing the Kelley Creek area as one of the areas to be mined, so as to sue in the alternative for such damages as it would be entitled to if allowed to mine only the portions that the defendant should reasonably designate, and so as to take a nonsuit and file the suit in equity if the defendant should choose to demur to the amended suit in law to reform the writing."

It is argued we have the power to do this under authority of T.C.A. sec. 27-329, which provides:

"The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the rights of the order, and upon such terms as may be deemed right."

██ We cannot agree. Counsel deliberately elected to sue for loss of profits without first seeking to have the contract reformed. The record shows the trial judge suggested to Counsel plaintiff should take a nonsuit. Counsel insisted upon plaintiff's election to sue for damages. By so electing under these circumstances, we cannot see how Counsel can now insist it was an oversight. Nor do we think we have the power to reverse and remand the case with leave to plaintiff to amend or sue in equity so as to seek a reformation of the contract; and, at the same time, deny to the defendant its right to rely on the doctrine of election of remedies as a defense.

The petition to rehear is denied with costs.

Petition denied.

Shriver and Humphreys, JJ., concur.