IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 6, 2006


BRODERICK AUTRY v. CHARLES BOSTON, JR., ET AL.


Appeal from the Circuit Court for Hamilton County
No. 04-C-284     Samuel H. Payne, Judge

---

No. E2005-001030-COA-R3-CV - FILED APRIL 28, 2006

---

Broderick Autry ("Plaintiff") sued Charles Boston, Jr. and Corrine Boston ("Defendants") claiming that Defendants had contracted to sell Plaintiff real property located at 2512 Ocoee Street in Chattanooga, Tennessee ("the Property") and had breached the contract. Defendants raised, among other things, a statute of frauds defense under Tenn. Code Ann. § 29-2-101. After a bench trial, the Trial Court held, *inter alia*, that Plaintiff had a valid contract for the purchase of the Property, and ordered Defendants to execute and deliver a warranty deed for the Property to Plaintiff within thirty days of the payment of the balance due by Plaintiff. Defendants appeal to this Court. We affirm by holding that although the writing produced as evidence of the contract does not satisfy the statute of frauds, Defendants are estopped from denying the existence and enforceability of the contract.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.


Hallie H. McFadden, Chattanooga, Tennessee for the Appellants, Charles Boston, Jr., and Corrine Boston.

Howard Barnwell, Chattanooga, Tennessee for the Appellee, Broderick Autry.

# OPINION

## Background

Plaintiff was married to Charles Boston's daughter ("Pam")[1]. Plaintiff claims that he and Defendants entered into an oral agreement in 2000, for Plaintiff and Pam to purchase the Property from Defendants. Plaintiff paid $2,000 to Mr. Boston and in return, Mr. Boston gave Plaintiff an undated receipt showing that Plaintiff paid $2,000 on an account of $10,000 leaving a balance of $8,000. This receipt stated that the $2,000 was paid for "down payment Ocoee." The receipt was signed by Charles Boston alone. No other writings were made in regard to the claimed oral agreement.

Plaintiff and Pam made extensive repairs to the Property and eventually moved into the house on the Property where they lived until Pam died "from cancer." After Pam's death, Plaintiff attempted to tender the $8,000 balance to Defendants who refused to accept it. Defendants denied ever making a contract to sell the Property to Plaintiff. Defendants sought a detainer warrant and had Plaintiff evicted from the Property. Plaintiff then filed this suit. The case was tried without a jury in January of 2005.

At trial, Plaintiff produced the original receipt as evidence of the alleged oral agreement and testified regarding the circumstances surrounding the making of the contract. Plaintiff testified:

> me and my wife went to Wilson Street, and that's where Mrs. Corrine was staying with her daughter - - her and Mr. Boston at this time - - and it was like in 2000, and I gave Mr. Boston a 2,000-dollar down payment on the property. His wife was present….She was present, and that was the first step as far as the property. That's what you asked about, right, how it first came about? I got the receipt. I got the original receipt.

Plaintiff testified he paid the $2,000 prior to starting work on the Property and that both Defendants were present when he paid this money. Plaintiff testified that he and both Defendants discussed the fact that "I was giving them $2,000 down payment on the house on Ocoee Street." Plaintiff further testified that they also discussed at that time: "It was $10,000 for the whole house. I gave him $2,000, and it left 8,000, and then he said give him $200 a month. That's what he wanted during that time." Plaintiff testified that at the time he paid the $2,000, he and Pam were taking care of Mr. Boston's mother and were living at her house.

---

[1] Pam Autry was the biological daughter of Mr. Boston, but was adopted by Mr. Boston's mother making Pam Autry legally Mr. Boston's sister. For purposes of simplicity, we refer to Pam Autry in this Opinion by her first name with no disrespect intended.

Plaintiff testified:

> Basically, that's it. After we did the business with the receipt and the money, I went to working on the house. The house was condemned so I had to go to a meeting with them at the City with Mr. Boston and Mrs. Corrine. Here's the paper right here (indicating) where we went to the City, and the house was condemned. I went with both of them. Both of them were present.

Plaintiff testified that "Mr. Boston never would accept the $200 a month because it was his daughter." Plaintiff testified:

> I gave [Mr. Boston] a couple of payments, and then he wouldn't take them anymore because he was like he really didn't know how - - the reason why he wouldn't take it was because the house was so ragged. Me and my wife just got married. He said that he didn't know how to charge us for the house. He said he only paid $4,000 for the house. He didn't want to overcharge us for the house. He was with Ms. Amanda at the time. She was like how are you going to charge them for that house and that house so ragged. That's how we started giving him no money. At this particular time, the house was still empty and condemned, and then me and my wife started working on this house.

Plaintiff testified that he and Pam fixed up the house and lived in it for at least a year and a half prior to Pam's death. He testified that it took them two years to repair the house. Plaintiff testified that he spent "almost 30 or [$]40,000" in materials repairing the house. When asked his opinion of the value of the repairs he and Pam did, Plaintiff stated: "Basically, when you do work like that, they charge twice the material, something like that, but I just cut it in half, about half price."

Plaintiff testified that he tried to pay the remaining $8,000 after Pam died, but Defendants would not accept this payment. Plaintiff testified:

> When my wife passed, I went to Mr. Boston, and I talked to him. He said well, it's just $8,000. You know you owe me that. I said well, I'll pay you that. I'll give you a check. He said - - well, at that particular time, he said okay because that's when my wife first passed because I wanted to know what was going on. Then I went to Mrs. Boston. When I went to Mrs. Boston, I said I was going to let her know - - I let her know that I was going to give her her $4,000 out of the money because they were still separated and making sure that I gave both of them their equal share where I could get my title and go on about my business. That's all I wanted.…I just wanted my house, and then he just went crazy and started talking crazy so I went and got a lawyer.

Plaintiff testified that prior to Pam's death, they were a close family and that Mrs. Boston saw him working on the house and saw it completed.

-3-

Mr. Boston testified the he purchased the Property "in about '97 or something like that" for "I think it was about $5,000, and then there was another payment to the man that was selling it to Mr. Durham which was about $2,000." Mr. Boston disputed Plaintiff's version of how the house was repaired. Mr. Boston testified:

What happened, there was the back porch that was in bad shape. So the inspectors, I guess, came around, and then they sent me a notice, and then I had it fixed and everything. So I had to get a roof, and I went and got a permit for a roof, and I had that fixed. Really, the house was livable after that....First of all, I had cabinets built, brand new cabinets built from top and bottom, and then sinks and everything all the way around. Then I had brand new carpet and padding put all the way through the house. I had plumbing done, and then I had central heat and air, and all the ducts were still in the house. I never had to do any repairs to that. The house was livable.

Mr. Boston testified that he let Pam and Plaintiff move into the house on the Property:

Mainly because they were really disturbing my mother because she was getting disturbed by all of the traffic coming in and out of her house, and then she spoke to me and my brother about it, and we asked him - - we said Broderick, you are going to have to leave here, Man, because she is getting disturbed, and they said they took care of my mother. My mother didn't have to have anybody. She had all of us to take care of her. They lived there because they didn't have - - I don't know if they had nowhere else to stay, but they lived on my mother and father. My father was dead. My mother took care of them.

Mr. Boston testified that neither Pam nor Plaintiff were working when they moved into the house, that the house was livable when they moved in, and that he never intended to sell it to them. Mr. Boston testified: "The receipt I gave him was because my daughter owed me money, and she gave me the money. He didn't give me the money to pay on the money that she already owed me." When asked, Mr. Boston testified he wrote that the receipt was for a down payment on Ocoee "[b]ecause my daughter suggested it."

When questioned, Mr. Boston admitted that Pam and Plaintiff did repairs to the Property. Mr. Boston stated:

I allowed them to redo what they had already started doing. I came up there sometimes, and they already towed whatever they wanted to. They never asked me could they do it. They took - - I had a fireplace with a mantle and a marble front on it. They just took that, and I've never seen it again. I asked him what happened. They threw it away, I guess.

Mr. Boston admitted that Plaintiff offered him the $8,000, and that he told Plaintiff that the house was not for sale.

Mrs. Boston testified that she and Mr. Boston are married but have lived separate and apart at times. She testified: "Well, we still do off and on because he has a brother that is kind of like non-functioned. He'll go over there and stay and take care of him awhile, and then he'll come back home like that, but he is just gone like maybe a day or two or three days out of the week." Later during the trial, Mrs. Boston testified that she and her husband "do live together."

Mrs. Boston testified she had no idea that her husband was selling the property to Plaintiff. When asked what her understanding of the arrangement was with Plaintiff and Pam living on the Property, Mrs. Boston stated, "they were living at 1104 Queens Drive with [Mr. Boston's] mother, and they had so many people running in and out of there until they asked them to leave out, and when they left out, that's where they went to, Ocoee Street."

Mrs. Boston testified that the house was in livable condition when Pam and Plaintiff moved in. She stated:

My husband was going to rent it out to - - I can't think of her name, but anyway, he was the football player that died, his mother, and then he - - Reggie White. That was his name. He found another house, and he bought it for his mother, and then right after that, that's when Pam and Tank (phonetic) moved in.

When questioned further, Mrs. Boston admitted that Plaintiff and Pam did renovations to the house. She stated: "They moved in that house even before they got through working on it." Mrs. Boston testified that "I didn't even know they were on Ocoee Street for the longest. I did not know it. I didn't even know that they were there, but I do know the house was in renovate condition because we were going to rent it, like I said, to Reggie White's mother, and then he found her a house, and he bought it for her. Soon after that, I guess, that's when they moved in,…."

Directly contrary to Plaintiff's testimony, Mrs. Boston claimed she never saw Plaintiff pay her husband $2,000, and was not there when her husband gave Plaintiff the receipt. She testified she did not know that Plaintiff attempted to give her husband the additional $8,000. Mrs. Boston denied that she ever went to a condemnation hearing with Plaintiff. Mrs. Boston testified that she was not present at the City condemnation hearing regarding this house, but that her husband was there representing her. Mrs. Boston testified:

The first time I heard about that house was when Pamela died. He came - - no, he didn't come to me. Pamela's mother was there. Her name is Norma, and we were sitting around talking, and she was talking about how she could not stand him, and we got to talking so she said he said that he was going to offer Charlie some money for the house. So I told her - - and I guess she went back and told him - - my name is on that house. He cannot buy that house. My name is on it. He wanted to buy it

after Pam died. I said no, my name is on that house, too. I will not sell it. Nobody. He has never ever came to me and asked me to buy the house. Never.

When Mrs. Boston was shown photographs of the Property at trial, she claimed they represented the house at the time the City was condemning it and stated: "Then that's when me, my son, and my husband, and there was another man, we went to Ocoee, and we started working on the house. We even put a central heat and air unit in the house." When asked about the photographs taken by Pam showing improvements to the house, Mrs. Boston stated:

I never - - no, I don't know about these. These, I don't. I'm not saying I do know. I do not know. Like I said, I did not go around Pam or Mr. Autry. I did not - - we didn't have a relationship, and you know that Autry. You know we did not have a relationship.

Ralph Boston, Mr. Boston's brother, testified via deposition. Ralph Boston testified that he lives in Ohio, but is familiar with the Property. Ralph Boston testified that Mr. and Mrs. Boston do not live together "to my knowledge" and have lived separately for several years. Ralph Boston testified that when Mr. and Mrs. Boston acquired the Property, it was in bad condition. Ralph Boston testified that approximately five or six years ago, Mr. Boston told him that he was going to sell the Property to Plaintiff and Pam for $10,000 and that Plaintiff and Pam gave Mr. Boston $2,000. Ralph Boston testified that he saw Plaintiff and Pam make improvements to the Property. Ralph Boston testified that it took Plaintiff and Pam "a good eight or nine months" or more to repair the Property. Ralph Boston testified that he saw the Property in its improved condition approximately two and a half years ago, prior to Pam's death. Ralph Boston testified that Mr. Boston told him that Plaintiff and Pam "owed him some money on [the Property]" and that Mr. Boston specifically told Ralph Boston that Pam and Plaintiff owed $8,000 on the Property. Ralph Boston testified that he had conversations with Mr. Boston on more than one occasion regarding the fact that Pam and Plaintiff were purchasing the Property. Ralph Boston testified that he talked to Mr. Boston after Pam's death and stated: "He told me that [Plaintiff] owed him the remainder of the money for what he was supposed, you know, pay for it." Ralph Boston testified that he never was told that Plaintiff and Pam were renting the Property. Ralph Boston testified he was at the Property on several occasions along with Mr. Boston, and that he witnessed Plaintiff and Pam making repairs to the Property. Ralph Boston testified that he would not lie for his brother or for Plaintiff and stated: "I love my brother, now, … blood is thicker than water." Ralph Boston testified there was never any doubt that Mr. Boston was selling the property to Plaintiff and Pam. When Mr. Boston was questioned regarding Ralph Boston's testimony, he denied that his brother ever heard him say anything about the house.

Amanda Denise Green Cowen testified that when she first met Plaintiff and Pam "[t]hey were redoing the property." Ms. Cowen testified that Mr. Boston told her, on two or three occasions, that he was selling the property to Plaintiff and Pam.

The Trial Court found Defendants' testimony to be both confusing and contradictory. This is evidenced by the fact that at the end of trial, the Trial Court stated:

> [Defendants] may not understand what's going on. What they say, for the record, doesn't make a lot of sense to the Court. I mean you contradict every record. You say you didn't pay $4,000. You swore you paid 4,000. You said you didn't sell the house. You said this was for Ocoee. Now, you say it doesn't. I don't know how to interpret your writing other than (unintelligible) you.

The Trial Court entered its final order on March 31, 2005, finding and holding, *inter alia*:

> Defendants contracted and sold the subject realty to the Plaintiff and his now deceased Spouse for the sum of Ten Thousand and N0/100 (sic) Dollars, with Two Thousand and N0/100 (sic) Dollars paid down in cash, and leaving a balance of Eight Thousand and N0/100 (sic) Dollars still due and owing that was to be paid on demand, that Plaintiff had previously tendered the amounts owed following the death of his Spouse and daughter of Defendants, but Defendants then refused and denied that a valid contract existed between them and had Plaintiff wrongfully evicted from said premises. It is therefore,
>
> **ORDERED, ADJUDGED,** and **DECREED** as follows:
>
> 1. Broderick Autry has a valid contract for the purchase of the Defendants' realty commonly known as 2512 Ocoee Street, Chattanooga, Hamilton, TN 37404, titled in the names of Charlie S. Boston, Jr. (a/k/a Charles Boston, Jr.) and Wife, Corine Boston (a/k/a Corrine B. Boston), ….

Defendants appeal to this Court.

### Discussion

Although not stated exactly as such, Defendants raise one issue on appeal: whether the Trial Court erred in holding that Plaintiff had a valid contract for the purchase of the Property.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Defendants argue that no valid contract for the sale of the Property exists because they never agreed to sell the Property to Plaintiff, and even if they did that under the Statute of Frauds, Tenn. Code Ann. § 29-2-101, an oral contract for the sale of land is unenforceable absent evidence of a signed writing. It is clear from our review of the record that the evidence does not preponderate against the finding of the Trial Court that Defendants agreed to sell the Property to Plaintiff and his now deceased wife for $10,000.

Now turning to the Defendants' statute of frauds defense, Tenn. Code Ann. § 29-2-101 provides, in pertinent part:

(a) No action shall be brought:

\* \* \*

(4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year; …

\* \* \*

unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

Tenn. Code Ann. § 29-2-101(a) (2000).

As our Supreme Court instructed in *Baliles v. Cities Serv. Co.*:

The purpose of the statute of frauds "is to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other." *Price v. Tennessee Products & Chemical Corporation*, 53 Tenn. App. 624, 385 S.W.2d 301 (1964). Consequently, to comply with the statute of frauds, a memorandum of an agreement to sell must show, with reasonable certainty, the estate intended to be sold.

Where the instrument is so drawn that upon its face it refers necessarily to some existing tract of land, and its terms can be applied to that one tract only, parol evidence may be employed to show where the tract so mentioned is located. But, where the description employed is one that must necessarily apply with equal exactness to any one of an indefinite number of tracts, parol evidence is not admissible to show that the parties intended to designate a particular tract by the description." *Dobson v. Litton*, 45 Tenn. 616. *See also Dry Goods Co. v. Hill*, 135 Tenn. 60, 185 S.W. 723 (1916).

*Baliles v. Cities Serv. Co.*, 578 S.W.2d 621, 623 (Tenn. 1979) (quoting *Dobson v. Litton*, 45 Tenn. 616, 620 (1868)). "The failure to show the state and county is fatal unless the description is otherwise so definite and exclusive that it does not reasonably appear that the description would fit any other tract." *Shelton v. Biddy*, No. 86-157-II, 1986 Tenn. App. LEXIS 3495, at *5 (Tenn. Ct. App. Nov. 26, 1986), *no appl. perm. appeal filed*, (citing *Kirshner v. Feigenbaum*, 176 S.W.2d 806 (Tenn. 1944)).

The receipt produced by Plaintiff at trial states it is for "down payment Ocoee." This description does not show with reasonable certainty the specific tract of land to be sold. Not only is no city or state mentioned, but no street or lot number is provided to identify the specific parcel referred to. The phrase "down payment Ocoee" could apply with "equal exactness to any one of an indefinite number of tracts" on Ocoee Street. *Baliles*, 578 S.W.2d at 623. It is unclear from the record on appeal whether Defendants own any other properties on Ocoee Street. As such, the description of the Property provided in the receipt fails to satisfy the statute of frauds.

In addition, the receipt fails to satisfy the statute of frauds in another important particular. Specifically, the receipt was signed only by Mr. Boston despite the fact that the Property is owned by Mr. Boston and Mrs. Boston. Tennessee law clearly provides: "To make the contract of sale good and valid, it must have been signed by all the owners, by themselves, or some one lawfully authorized to sign their names for them, not by one of them alone." *Bradley v. Pen Tax Corp.*, No. 89-416-II, 1990 Tenn. App. LEXIS 202, at *7 (Tenn. Ct. App. March 28, 1990), *no appl. perm. appeal filed*, (quoting *Frazer v. Ford*, 39 Tenn. 464, 466 (1859)).

Defendants have a valid statute of frauds defense to the receipt produced by Plaintiff. This, however, does not end the inquiry. It is well settled in Tennessee that an oral contract for the sale of land will not be enforced on the basis of part performance, nor will part performance take an oral agreement out of the statute of frauds. *E.g., Baliles*, 578 S.W.2d at 624. However,

> [t]he harshness of this rule has been mitigated by the application of the doctrine of equitable estoppel in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud.
>
> > "Equitable estoppel, in the modern sense, arises from the 'conduct' of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel."

*Baliles*, 578 S.W.2d at 624 (quoting *Evans v. Belmont Land Co.*, 21 S.W. 670, 673-74 (Tenn. 1893) (citations omitted)).

As this Court has stated:

the statute [of frauds] should be strictly adhered to and construed to accomplish its purpose, … [however] it should not be used to avoid contracts or to "grant a privilege to a person to refuse to perform what he has agreed to do."….The courts have accordingly recognized that equitable estoppel is an exception to the statute of frauds, and that equitable estoppel can be used to relieve a party from the statute of frauds where enforcement would make the statute an instrument of hardship and oppression."

*Ogle v. Ogle*, No. 03A01-9301-CV-00354, 1994 Tenn. App. LEXIS 69 (Tenn. Ct. App. Feb. 17, 1994), *no appl. perm. appeal filed*, (quoting *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 611 (Tenn. Ct. App. 1990) (citations omitted)).

This Court recently addressed a situation factually similar to the case at hand in *Smith v. Smith*, No. M2004-00257-COA-R3-CV, 2005 Tenn. App. LEXIS 733 (Tenn. Ct. App. Nov. 22, 2005), *no appl. perm. appeal filed*. The *Smith* case involved a handshake transaction between family members for the purchase of real property. *Id.* at *1. When one of the sellers died, his widow attempted to avoid the transaction under the statute of frauds. *Id.* at *1-2. This Court held that the widow was equitably estopped from avoiding the transaction because of her omissions as well as her commissions. *Id.* at *22-27. Specifically, the widow in *Smith* knew of the sale and never objected, knew that the buyer had moved his business on to the property in question and had made improvements, made comments to third parties regarding the sale, and accompanied her husband and the buyer on an unsuccessful trip to the bank to execute a deed and promissory note. *Id.* This Court granted the buyer in *Smith* specific performance and stated:

The question of whether a contract should be specifically performed depends upon the facts of each case, and is a matter addressed to the sound discretion of the trial court. *Hillard v. Franklin*, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000). Specific performance is only appropriate where the contract is clear, definite, and free from any suspicion of fraud or unfairness. *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979).

However, our courts have long recognized the preference for specific performance when dealing with contracts for the conveyance of real property, "because real property is unique, and more often than not, an award of damages is simply not an adequate remedy." *GRW Enterprises, Inc.*, 797 S.W.2d at 614; *see also Shuptrine*, 597 S.W.2d at 730; *McGaugh v. Galbreath*, 996 S.W.2d 186, 191 (Tenn. Ct. App. 1998). Because of the unique nature of real property, this court has given its approval to the proposition that "equity will decree specific performance of

-10-

a contract for sale of land, as a matter of course, in the absence of any valid objection, where the contract is valid." *Brister v. Brubaker's Estate*, 47 Tenn. App. 150, 336 S.W.2d 326, 332 (Tenn. Ct. App. 1960).

*Id*. at *28-29.

It is clear from the record on appeal that the Trial Court found Plaintiff and his witnesses more credible than Defendants. "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)).

Mrs. Boston's testimony was particularly contradictory. She testified at one point during trial that she did not even know that Pam and Plaintiff were living on the Property, but then stated at another point: "They moved in that house even before they got through working on it." Mrs. Boston testified that she and her husband did the work on the Property, but later admitted that Pam and Plaintiff renovated the Property. In addition, although it is immaterial to the issues at hand, Mrs. Boston testified that she and Mr. Boston lived separate and apart and also testified that they "do live together." Mrs. Boston also evidenced hostility toward Plaintiff, even though she referred to him at some points during her testimony by the apparently friendly nickname of "Tank." Mrs. Boston, for example, also referred to Plaintiff in a less friendly manner at other times during her testimony as "that Autry."

The evidence shows that Plaintiff and Pam moved into the house on the Property and made improvements. Defendants knew of these improvements and, at the very least, never objected to them. Defendants accepted the $2,000 down payment from Plaintiff. In addition, the evidence shows that Defendants told disinterested third parties that the Property was being sold to Plaintiff and Pam including telling these third parties about the sales price and the amount still owed. Defendants cannot now avoid selling the Property simply because Pam unfortunately died young. To enforce the statute of frauds given the facts of this case would make it an instrument of hardship and oppression, verging on actual fraud.

"[I]f the Trial Judge reached the right result for the wrong reason, there is no reversible error." *Shutt v. Blount*, 249 S.W.2d 904, 907 (Tenn. 1952). The proper application of equitable estoppel to the facts of this case relieves Plaintiff from the application of the statute of frauds. As the Trial Court reached the right result in holding that Plaintiff had thirty days within which to tender the $8,000 balance of the purchase price, and in ordering Defendants to execute and deliver a warranty deed for the Property to Plaintiff within thirty days of that payment, we affirm.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Charles Boston, Jr., and Corrine Boston, and their surety.

_____
D. MICHAEL SWINEY, JUDGE